IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 3:17-cr-00032 |
| v. ) | |
| ) | Judge Richardson |
| JAMES FREI ) | |

**SENTENCING MEMORANDUM ON BEHALF OF THE UNITED STATES**

The United States of America, by and through Donald Q. Cochran, United States Attorney, and Kathryn D. Risinger and Chris Suedekum, Assistant United States Attorneys, submits this sentencing memorandum in this matter.

On February 14, 2019, following a three-day trial, a jury found the defendant guilty of four counts of production of child pornography, one count of enticing a minor to engage in sexual conduct, two counts of traveling in interstate commerce for the purpose of engaging in illicit sexual conduct with a minor, and one count of transporting child pornography. (D.E. 63.) The Presentence Investigation Report (PSR) states that the defendant's advisory guideline range is life imprisonment, based upon a Total Offense Level of 43 and a Criminal History Category I.[1] In light of the guideline range and the facts relevant to the sentencing factors discussed below, the United States requests a sentence of life imprisonment and submits that it is the appropriate sentence in this case.

**I.    CONSIDERATION OF THE SENTENCING FACTORS IN 18 U.S.C. § 3553(a)**

While a sentencing court must start any sentencing procedure with a calculation of the applicable Guideline range, the court must then consider the argument of the parties and factors

---

[1] The United States notes that the defendant's total offense level is actually 47, but is adjusted down to 43 because the sentencing guideline table does not contemplate sentencing ranges above offense level 43. (PSR ¶ 70.)

set forth in 18 U.S.C. § 3553(a). *See Peugh v. United States*, 569 U.S. 530 (2013). Pursuant to 18 U.S.C. §3553(a), a court shall consider the following factors, among others, when sentencing a defendant: the nature and circumstances of the offense and the history and characteristics of the defendant; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to afford adequate deterrence to criminal conduct; and the need to protect the public from further crimes of the defendant. *See* 18 U.S.C. §3553(a)(1), (2)(A)-(C).

1. **Nature and Circumstances of the Offense**

    i. Summary of Evidence Presented at Trial

In the spring of 2016, the defendant—a 47-year old male living in North Carolina—accessed a Facebook group for teenagers, where he identified and preyed upon a 15-year old girl, T.B., who lived in Nashville. Over the next few days, the defendant manipulated the minor victim by showering her with attention, compliments, and promises of affection. From the defendant's very first messages, his intentions were clear: he told T.B. that she was "sexy" and eventually told her that he would teach her (a 15-year old virgin) about all kinds of sex. At trial, T.B. explained that she was accepting of the defendant's advances because she was depressed and lonely; she felt distant from her parents and was being made fun of at school—by people she thought were her friends—for having diabetes. The defendant took advantage of the minor victim's vulnerability. Over the course of several days, the defendant groomed T.B., eventually convincing T.B. to let the defendant travel to Nashville to meet her and have sex with her, as well as to photograph and video them while having sex.

The defendant knew from the outset that T.B. was a minor and only 15 years old; in fact, she had told him as much during their very first conversation. Far from being reluctant or

concerned about T.B.'s young age and lack of maturity, the defendant told T.B. that he thought she looked even younger than 15 years old, and that he meant that in a "good way." Once the defendant succeeded in enticing T.B., he traveled to Nashville on at least three occasions to have sex with her. On each occasion, the defendant took sexually explicit photographs and/or videos of the minor victim.

During the defendant's first trip, on May 8, 2016, the defendant drove 5 hours through the night from North Carolina, carefully planning his trip to arrive after the victim's father had left for work so that no adults would be home to interfere with his plans. As soon as he arrived at the minor victim's apartment, the defendant immediately initiated his first sexual encounter with T.B., having sex with her on a couch in the living room. The defendant then drove T.B. to a park near her home, where he performed oral sex on her in the car. Afterwards, the defendant led her into the park, where he had T.B. perform oral sex on him. Then, the defendant again had sex with T.B. During these encounters, the defendant repeatedly used his cellphone to record them having sex.

Nine days later, on May 17, 2016, the defendant returned again to have sex with T.B. During this second trip, the defendant recorded a video of T.B. performing oral sex on him. And during his third trip, in June 2016, the defendant booked a hotel room for multiple days, as he was intending to meet and have sex with T.B. multiple times. The defendant brought T.B. to his hotel room twice, on June 3 and June 5, where he again tried to persuade the minor victim to have sex with him and used his cellphone to take naked photos of T.B.

The defendant's actions were uncovered when the National Center for Missing and Exploited Children (NCMEC) sent a Cyber Tipline Report to the Metro Nashville Police Department (MNPD). MNPD Detective Adkins began an investigation, and was able to identify both T.B. and the defendant. Working with law enforcement in North Carolina, Detective Adkins

3

Case 3:17-cr-00032   Document 91   Filed 01/06/20   Page 3 of 9 PageID #: 457

eventually was able to obtain a search warrant for the defendant's home.

When the defendant was confronted by police, he acknowledged that he knew T.B. was only 15 years old, and admitted to having had sex with her and to taking photos and videos of them engaging in sexual conduct. The defendant claimed, however, that he had deleted all of the images of child pornography off his cell phone. He also claimed that he no longer had the phone because it had broken. Contrary to his claim, the defendant's cellphone was still in his home and police seized it after Detective Adkins heard a message notification. When law enforcement subsequently examined the defendant's cellphone, they found numerous photos and videos the defendant had taken of himself engaging in sexual acts with T.B.

MNPD Detective Chad Gish examined the phone and testified that there were also screenshots of these videos, including images dated May 11 and 16, 2016, from where the defendant was replaying the videos he had made during the first trip and taking screenshots to capture images from the videos.

ii. Additional Evidence Not Presented at Trial

Although not presented at trial, law enforcement's investigation of the defendant revealed that the defendant's possession of child pornography was not limited to the videos and images of T.B. (*See* PSR ¶¶ 23, 26, 75.) The defendant admitted to searching for and trading child pornographic images of preteens—including boys and girls as young as 5 to 10 years old. The defendant initially claimed that he only had "a few" images of underage girls on his phone, but when Detective Adkins challenged him, the defendant quickly admitted that there were probably a "couple hundred" images. During a subsequent examination of the defendant's phone, police found approximately 500 images and videos of child pornography. The defendant told Detective Adkins that he had been downloading child pornography and trading the images for approximately

4

10 years.

The defendant also admitted to meeting or talking with minors as young as 10-15 years old on the internet and said that he talked to minors about sex. The Facebook records obtained for the defendant's account shed light on how the defendant had trawled for and located minors like T.B. to prey upon. On his Facebook account, the defendant had joined dozens of Facebook groups, including groups such as the following examples: "Seductive Naughty Boys & Girls <3"; "Official {13-19} Teenage Dating"; "2016 teens 13-19"; "Cute Teen Girls ONLY!!! ;D"; "HORNY TEENS"; "Single teens ♥♥♥"; "bi girls 14 & older"; "Uncensored Teens"; "Naughty At Younger Age <> 16 to 60<>."

The NCMEC Cyber Tip also contained excerpts of Facebook communications between the defendant and another individual, "Peter Nowak," from May 21, 2016. In the messages, the defendant shared images, which are believed to be child pornographic images of teenage girls.[2] In discussing the pictures, the defendant told Nowak that he was the male in the images, and bragged about having had sex with the 14 year-old and 15 year-old girls in the images, referring to them as "my 14" and "my 15." The defendant bragged to Nowak that he had taken each minor's virginity "[a] few weeks ago" and had then had sex with each of them again on subsequent occasions. The timing of these communications, two weeks after the defendant first traveled to have sex with T.B., strongly suggests that T.B. was one of the minor victims about which the defendant was boasting and sharing images.

2. **History and Characteristics of Defendant**

The defendant is 50 years old, and has a history of engaging in inappropriate and illegal sexual conduct with minors, as well as possessing and trading child pornography. (PSR ¶¶ 23, 26,

---

[2] The actual images appear to have been deleted, and so were not reproduced in the NCMEC Cyber Tip or in the records produced from Facebook.

74, 75.) As noted in the PSR, the defendant has a North Carolina conviction for sexual exploitation of a minor in 2016, much of which concerned other images of child pornography found on the defendant's phone (i.e., images other than those of T.B.). (PSR ¶ 75.) The images found on the defendant's phone included images of adults engaging in sexual activity with children as young as 3 to 4 years old. (*Id.*) The defendant also pled guilty in 2000 to "accosting children for immoral purposes" in Michigan. (PSR ¶ 74, *see id.*, ¶ 23.) While the details of this incident were not available from Court records, the defendant told Detective Adkins the conviction was based on an incident where a minor agreed to show the defendant her breasts while he was delivering pizzas to the home. (*See* PSR ¶ 74 (there were four additional charges, for providing alcohol to minor(s), which ultimately were dismissed).)

While Detective Adkins was questioning the defendant in connection with this case, the defendant admitted to having a sexual attraction to teenage girls (specifically identifying 15-17 year-old girls), said that he had talked to "hundreds" of girls online, and admitted that his conversations with minors were sexual in nature. Detective Adkins told the defendant that he believed the defendant's attraction to minors caused the defendant to search for nude images of minors, to attempt to meet with them, and to travel to have sex with them. The defendant acknowledged that was "semi-accurate," although he claimed that he did not always travel to have sex with minors. The defendant did, however, admit that he had attempted to make arrangements with 10-12 underage girls to have sex with them. But the defendant claimed that T.B. was the only underage girl that he actually met. Based on the defendant's pattern of behavior, as well as his Facebook communications with Nowak, the United States does not believe the defendant's claim is credible.

As detailed in the PSR and above, the United States submits that the defendant's sexual

exploitation of T.B. in this case was not an isolated event, nor was it out of character; instead, it appears to have been consistent with a pattern of illegal behavior by the defendant as a result of his admitted sexual attraction to minors. When confronted about his behavior, the defendant largely admitted to his illegal conduct, but largely appeared unremorseful about what he had done. For example, when being questioned about his sexual exploitation of T.B., the defendant explained to Detective Adkins that he thinks there is nothing wrong with talking to younger people about sex, that he views 16 year-olds as "adults," and admitted to attempting to meet and have sex with 10-12 underage girls.

As for the other information contained in the Offender Characteristics section of the PSR, the Government is not in a position to dispute or affirm the defendant's background and personal details.

### 3. Seriousness of the Offense and Deterrence

The offenses of conviction are serious crimes that can have devastating and long-term effects on the minor victims as a result of their youth and vulnerability. As T.B. testified at trial, she has been mentally and emotionally impacted by the defendant's exploitation of her. (*See* PSR ¶ 29.) And, in addition to the defendant manipulating the minor victim to have sex with her, he further exploited her by taking photographs and videos of him having sex with her. As discussed above, the United States believes that the defendant may have shared these images with other individuals, such as Peter Nowak. Given the extent of the defendant's conduct, there is a significant need for deterrence in this case, both general deterrence for others in society who might engage in similar behavior, as well as specific deterrence to ensure that the defendant is unable to commit similar crimes in the future.

### 4. The Need to Avoid Unwarranted Sentence Disparity

The United States submits that it is important to impose a guideline sentence in this case to avoid unwarranted sentencing disparities. As noted in the PSR, the defendant's guideline range is life imprisonment as a result of a Total Offense Level of 43 (the highest contemplated by the table). However, but for the fact that the guidelines cap the offense level at 43, the defendant's offense level would have been even higher (47). (PSR ¶ 70.) Thus, if the Court were to depart or vary downward, it would create an even greater sentencing disparity in comparison to the true severity of the defendant's conduct. Accordingly, the United States requests a sentence of life imprisonment, which is the sentence contemplated by the U.S.S.G., adequately takes into consideration the defendant's guideline range, his criminal history, and will adequately reflect the need for punishment and deterrence. The recommended sentence ensures no unwarranted sentencing disparities, while giving appropriate consideration to the defendant's personal characteristics.

## CONCLUSION

For all of the reasons set forth above, and in order to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, and due to the nature and characteristics of the defendant, and the need to protect the public from future harm by the defendant, the United States respectfully submits that the Court impose a guideline sentence of life imprisonment.

Respectfully submitted,

DONALD Q. COCHRAN
United States Attorney

/s/ *Chris Suedekum*
CHRIS SUEDEKUM
KATHRYN D. RISINGER
Assistant U.S. Attorney
110 9th Avenue South
Nashville, Tennessee 37203
Phone: (615) 736-5151

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing will be served electronically to counsel for defendant via CM/ECF on the 6th day of January 2020.

/s/ *Chris Suedekum*
CHRIS SUEDEKUM