```
 1              IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF TENNESSEE
 2                    NASHVILLE DIVISION

 3
    UNITED STATES OF AMERICA          )
 4                                    )
                                      )
 5       v.                           ) 3:17-CR-00032-1
                                      ) JUDGE RICHARDSON
 6                                    )
    JAMES FREI                        )
 7                                    )
                                      )
 8    -----------------------------------------------------------

 9

10

11

12


13      BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE

14
                        TRANSCRIPT OF PROCEEDINGS
15                        SENTENCING HEARING

16
                          January 13, 2020
17

18

19

20

21
22    -----------------------------------------------------------
23    DEBORAH K. WATSON, RPR, CRR, LCR
      Official Court Reporter
24    801 Broadway, Room A837
      Nashville, TN 37203
25    debbie_watson@tnmd.uscourts.gov
```

```
1    APPEARANCES:

2

3    For the Government:

4              MR. J. CHRISTOPHER SUEDEKUM
                MS. KATHRYN RISINGER
5              Assistant U.S. Attorneys
                U.S. Attorney's Office
6              Middle District of Tennessee
                110 Ninth Avenue South
7                Suite A961
                Nashville, TN 37203-3870
8              (615) 736-5151
                chris.suedekum@usdoj.gov
9              katy.risinger@usdoj.gov

10

11   For the Defendant:

12             MR. MICHAEL DAVID NOEL
                40 Burton Hills Boulevard
13               Suite 200
                Nashville, TN 37215
14             (615) 373-5597
                mdnoel02@bellsouth.net
15
                MR. CHARLES D. BUCKHOLTS
16             40 Burton Hills Boulevard
                 Suite 200
17             Nashville, TN 37215
                (615) 386-7118
18             chuck@buckholtslaw.com

19

20

21

22

23

24

25
```

1

2                         I   N   D   E   X

3                                                     Page

4
    ARGUMENT BY MR. SUEDEKUM                            32
5

6   VICTIM IMPACT STATEMENT
    Read by Mr. Suedekum                                32
7

8   ARGUMENT BY MR. BUCKHOLTS                           52

9
    ALLOCUTION BY THE DEFENDANT                         64
10

11  JUSTIFICATION BY THE COURT                          66

12
    SENTENCE BY THE COURT                               85
13

14

15

16

17

18

19

20

21

22

23

24

25

1                         *   *   *

2          The above-styled cause came on to be heard at 2:24

3     p.m. on January 13, 2020, before the Honorable Eli J.

4     Richardson, District Judge, when the following proceedings

5     were had, to-wit:

6

7               THE COURT:  We are here this afternoon in the

8     matter of *United States vs. James Frei*.  The case number is

9     3:17-cr-232 [sic].

10              In this case, the Defendant, Mr. Frei, was

11     convicted at a jury trial on each of the eight counts

12     remaining in a nine-count indictment charging him with

13     various events.  And, in particular, the jury in this case

14     returned a guilty verdict on February the 14th of this year

15     and found the Defendant guilty of the following counts:

16              1 through 4 each charging production of child

17     pornography in violation of Title 18, United States Code,

18     Section 2251(a).

19              Also Count 5 charging enticement of a minor to

20     engage in sexual conduct in violation of Title 18, United

21     States Code, Section 2422(b).

22              Also finding Mr. Frei guilty of Counts 6 and 7

23     charging him with traveling in interstate commerce for the

24     purpose of engaging in illegal or illicit sexual conduct with

25     a minor in violation of Title 18, United States Code,

1    Section 2423(b).

2            And also on Count 9, transportation of child

3    pornography in interstate commerce in violation of Title 18,

4    United States Code, Section 2252A(a)(1).

5            So we are here for sentencing on those counts.

6    And in this case, the Court has reviewed a variety of

7    different documents; and it has, among other things, reviewed

8    the parties' sentencing memorandum, their position regarding

9    the presentence report.  Their respective positions regarding

10   the presentence report, we're going to touch on.  I don't

11   believe that we have objections to the guidelines calculation

12   but we do have a couple of points that the Defense raised.

13           The Court has reviewed the -- of course, the

14   indictment filed in this case.  It's aware of the dismissal

15   of Count 8 as well.  It is, of course, familiar with the

16   entire trial proceedings, having adjudicated the trial and

17   presided over it.

18           The Court is also familiar with the stipulation in

19   consent of forfeiture.  Forfeiture is something the Court

20   will need to address.  The Court is familiar with, also, the

21   written victim impact statement of the minor victim in this

22   case.

23           The Court, thus, is very familiar with the record

24   and is prepared to address sentencing at this time.

25           If Counsel could make their appearances, please.

1          MR. SUEDEKUM:  Good afternoon, Your Honor.  Chris
2    Suedekum and Katy Risinger for the United States.
3          THE COURT:  Good afternoon, Mr. Suedekum.
4          MR. BUCKHOLTS:  And Charles Buckholts and Michael
5    Noel here for Mr. Frei.
6          THE COURT:  All right.  Good afternoon,
7    Mr. Buckholts.
8          We are going to take this hearing in several
9    steps.  First, we're going to review the presentence report
10   and address any objections to the report.  After we do that,
11   with evidence or argument as needed, we will review the
12   sentencing guidelines and the calculations thereof, and I
13   will rule on the appropriate advisory guideline ranges.  Of
14   course, those are advisory only.  What is not advisory only
15   are the mandatory minimums, but subject to the mandatory
16   minimums, the Court has the discretion to impose sentence
17   where it sees fit under the applicable Section 3553(a)
18   standards.
19         After ruling on the advisory sentencing ranges, I
20   would consider any motions for a downward departure.  There's
21   one issue that is technically in this case styled as a
22   departure, but seems to me it really should be considered
23   more of a sentence adjustment issue under 5K2.23.
24         There is -- also, after that, we'll have a final
25   guideline post-departure set of ranges that are announced.

1   At that point, the Court, viewing the guideline ranges as

2   advisory only, will consider what sentence to impose under

3   Section 3553(a), and the parties are free to introduce

4   evidence and argument as they see fit related to what

5   sentence is appropriate.

6           Mr. Frei also will have the opportunity to address

7   the Court and allocute if he wishes to do so, although he is

8   not required to do so.  After these things are done, the

9   Court will discuss the facts of this case as they relate to

10  the appropriate sentencing standards and will pronounce

11  sentence, and then the Court will advise Mr. Frei of his

12  rights to appeal.

13          And the Court, as it says, will start with the

14  presentence report which it has reviewed in full.

15          And I'm going to start by asking you,

16  Mr. Buckholts, whether you have been able to review the

17  presentence investigation report, the PSR as we call it, to

18  your full satisfaction with Mr. Frei together with the

19  addenda to the PSR.

20          MR. BUCKHOLTS:  We have, Your Honor.  We, on

21  multiple occasions, have gone over it and some of the changes

22  that were suggested, and we have fully reviewed it.

23          THE COURT:  All right.  Thank you, sir.

24          MR. BUCKHOLTS:  Judge, this might make it easier,

25  too.  I know one of the issues in there is the restitution.

1  Mr. Frei, we've discussed that with Mr. Frei, and he is in

2  agreement with the restitution amount.

3          THE COURT:  Okay.  Very well.  Thank you.

4          I wanted to then ask you, Mr. Frei, whether you

5  have been able to review the PSR and the addenda to the PSR

6  to your full satisfaction and been able to discuss it with

7  Mr. Noel and Mr. Buckholts to your full satisfaction.

8          THE DEFENDANT:  Yeah, Your Honor, we've discussed

9  it on numerous occasions.

10          THE COURT:  Very well.  Thank you.  Are you

11  satisfied with their representation as your attorneys?

12          THE DEFENDANT:  Yeah.

13          THE COURT:  Any complaints at all about that?

14          THE DEFENDANT:  No, sir.

15          THE COURT:  Okay.  Very well.

16          All right.  The Court notes that the Government

17  does not appear to have any objections to the PSR.  Is that

18  fair to say, Mr. Suedekum?

19          MR. SUEDEKUM:  That's correct.

20          THE COURT:  All right.  Thank you.

21          So Mr. Buckholts, I see that in the position of

22  the Defendant regarding the PSR, the Defendant has no

23  objections to the statutory ranges that appear stated in the

24  PSR and the sentencing guidelines calculations, but there are

25  a couple of things that the Defendant believes need to be

1    changed.  And I'm going to take this as an objection to the

2    use of the information at paragraph 23 for purposes of

3    sentencing.

4              As you have written, Mr. Frei, in response to the

5    footnote of paragraph 23 on page 13, Mr. Frei requests that

6    the first sentence in this footnote state:  Mr. Frei disputes

7    the date, the parties involved, and material aspects of the

8    information set forth in this paragraph.

9              And to me, that sounds like what you're saying is,

10   look, paragraph 23, A, it's sort of unproven unless and until

11   the Government has proven it.  Mr. Frei does not believe this

12   is accurate.  He wants to put the Government to its proof on

13   this particular piece of what's in the PSR.

14             And, of course, there may be trial testimony on

15   this as well, but -- and the Defense is requesting that the

16   Court not rely upon the information in paragraph 23 for

17   purposes of sentencing.

18             Is that what you're saying there?

19             MR. BUCKHOLTS:  Yes, Your Honor, discussing to

20   some extent:  Some of this information was taken out of a

21   search warrant and some of these statements that Mr. Frei

22   asked us in the footnote to address, we have addressed those.

23   We're not asking for a minitrial or anything over those

24   issues, but he did want his position known, put in the PSR as

25   to those statements in there.

```
 1              THE COURT:  Okay.  Very well.  All right.  Thank
 2    you.
 3              So I want to ask the Government their position on
 4    this.  And it seems like the Government probably has three
 5    different possible approaches here.  One is to say, well,
 6    look, we're not going to rely on it.  We'd ask the Court not
 7    to rely on it, and we can move on.  That's Option No. 1.
 8              Option No. 2 is, you know, Judge, you should be
 9    directed to information already of record in this case where
10    there was evidence at trial sufficient to establish these
11    facts by a preponderance of the evidence.
12              Option No. 3 is, well, that hadn't been done yet,
13    but we propose to put on a witness to establish these facts
14    right now.
15              Seems to me those are probably the Government's
16    three options.
17              Mr. Suedekum, what's the Government's take on
18    this?
19              MR. SUEDEKUM:  Your Honor -- and I may have
20    printed out the older copy of the PSR.  It may be helpful to
21    know specifically to what facts it is the Defendant is
22    disputing.  We'll say for the Court's benefit, paragraph 23
23    is largely, if not entirely, based on statements made by the
24    Defendant during a recorded interview at his residence in
25    North Carolina at the time the search warrant was conducted.
```

1   So it might be helpful to note specifically really what it is

2   Mr. Frei is objecting to and wishes to dispute, because that

3   may factor into how we proceed.

4               THE COURT:  All right.  So let me put it this way.

5   So -- and, you know, I think Mr. Buckholts probably does it

6   this way to sort of keep his options open and speak more

7   broadly:  Mr. Frei disputes the date and the parties involved

8   and material aspects of the information set forth in this

9   paragraph.

10              It's kind of broad, and it does leave open the

11  possibility that, you know, some of this he doesn't really

12  object to.  It's very specific things.

13              Can we go even sentence by sentence,

14  Mr. Buckholts, and see what the disagreement is?  So, for

15  example, if there's a dispute about the dates and the parties

16  involved, that lends itself to the question, well, does

17  Mr. Frei take the position that, in fact, there were not

18  representatives of the North Carolina State Bureau of

19  Investigation that traveled to his residence?  Is it that --

20  you know.  So I'm wondering if we should go sentence by

21  sentence.

22              MR. BUCKHOLTS:  May I have a moment?

23              THE COURT:  Uh-huh.

24              (Respite.)

25              MR. NOEL:  May it please the Court, we're trying

1  to look at it line by line.

2          THE COURT:  Very well.  Should we take a recess?

3          MR. NOEL:  I think we've about got it.

4          THE COURT:  Okay.  Very well.  Thank you.

5          (Respite.)

6          THE COURT:  All right.  What do you think,

7  Mr. Buckholts?

8          MR. BUCKHOLTS:  Judge, speaking with the

9  Government, speaking with Mr. Frei on this, in that

10  paragraph, that specific paragraph 23, it looks like there

11  were a couple of -- like, multiple interviews that were

12  conflated.  One of those which has caused some of the, you

13  know, the problem and confusion, for instance, in the first

14  sentence, there was an interview where there were no Metro

15  Nashville -- I don't believe -- any Tennessee agents at that

16  time.  So some of this is just dealing with the parties

17  involved.

18          So when we responded, the other -- there are some

19  substantive issues.  I'm going to try to find the -- the

20  second sentence, I believe, was disputed:  Mr. Frei admitting

21  to downloading and trading the child porn for the past ten

22  years, that sentence.

23          The other sentence related -- the next couple of

24  sentences related -- he believes he was talking to them about

25  participating in FarmVille, which is a social media account.

1  Communicating with young minors on the Internet, playing

2  FarmVille.  And then also, his account had been hacked.

3          THE COURT:  So one moment.  So if we do that,

4  on -- and I see the sentence beginning, "During the

5  interview," it looks like Mr. Frei disputes admitting this,

6  right?  So the second sentence.  Of course, the first

7  sentence, he thinks there's a conflation of multiple

8  interviews and who was present.

9          Second sentence, though, he disputes admitting he

10  downloaded and traded child pornography for the past ten

11  years and admitted to facilitating the e-mail account in

12  order to trade child pornography among other individuals.

13          I believe you're telling me that Mr. Frei disputes

14  that he admitted these things, and he probably also disputes

15  that he did these things.  Is that fair to say?

16          MR. BUCKHOLTS:  At least that he did those things.

17  I'm just trying to make sure that I'm not mistaken on the

18  conflation of the interviews myself.

19          THE COURT:  Why don't we -- does it make sense to

20  take a few minutes?  And I want to -- you know, if you tell

21  me, well, it's not necessary, that's fine, we can try and

22  continue.  But if it might make sense both for you to figure

23  out kind of just what your client's position is and also for

24  the Government to get ready, based on what the clarification

25  may be as to what it may need to show me if it wants me to

1    rely on this, the Government would have an opportunity to

2    take a few minutes to get its ducks in a row.

3              What do you think?

4              MR. BUCKHOLTS:  I think that's fair, Your Honor.

5              THE COURT:  Does that make sense to y'all?

6              MR. SUEDEKUM:  That's fine, Your Honor.

7              THE COURT:  Okay.  Because I do think with this

8    objection made, the Court's got to do one of two things:

9    either decide, for one or more reasons, it's not going to

10   rely on this, or look at it and say, this is the kind of

11   thing, if established by a preponderance, I need to rely on.

12             And if the Government is not going to say, Court,

13   we don't think you should rely on it, I have to keep that

14   option open.  And so we need to figure out where we are on

15   what is being objected to exactly and whether the Government

16   can prove by a preponderance that those objections should be

17   overruled.  Does that make sense?

18             IN UNISON:  Yes, Your Honor.

19             THE COURT:  Let's take a few minutes, and in a few

20   minutes, we'll have Ms. Jackson come out and see where the

21   parties are on this.

22             (Recess 2:49 p.m. to 2:58 p.m.)

23             THE COURT:  All right, Counsel.  Where do we stand

24   on paragraph 23?

25             MR. SUEDEKUM:  Your Honor, the parties have

1    deferred it, and we've agreed to simply request that

2    paragraph 23 be deleted from the PSR and not be used as a

3    basis for the Court's sentencing decision.

4             THE COURT:  All right.  Thank you, very much.

5    What we will do is, I will order the probation officer to

6    delete that.  The Court understands that the probation

7    officer well may have had a basis, but the Government does

8    not intend to rely on it or intend to establish it by a

9    preponderance here today, and the Court will not rely on

10   those facts, so we will continue.  So that's one of the two

11   things that the Defense said in response to the PSR.

12             The other was this:  In paragraph 92 on page 29,

13   second line down, here, I was not exactly sure what the issue

14   was.  It looks like the Defense has mainly requested that the

15   prosecutor get replaced with:  Ms. Womack, open paren,

16   prosecutor, closed paren; is that right?

17             MR. BUCKHOLTS:  Yes, Your Honor.  And that, just

18   to give a little bit more light on what looks like happened

19   there.  Ms. Womack was the actual -- at the time or after his

20   arrest, she brought his son to meet the Defendant.  And we

21   put in parentheses "prosecutor" because she was prosecuting

22   the child support case.  I know sometimes what we think

23   probably happened was, as it happens in Davidson County

24   oftentimes, they -- a police officer may be listed as a

25   prosecutor, and that's -- so the way it was phrased, it

1  looked like an actual prosecutor.

2          THE COURT:  Government official --

3          MR. BUCKHOLTS:  Yes.

4          THE COURT:  -- when really, it was a private

5  citizen prosecuting their child support action; is that

6  right?

7          MR. BUCKHOLTS:  Yes, that's correct.

8          THE COURT:  Okay.  Now, I wonder if the reference

9  to "with him" should be "with her"?

10          MR. BUCKHOLTS:  Yes, Your Honor, it should.

11  That's correct.

12          THE COURT:  Okay.  Could we agree that we say:

13  "Ms. Womack, the person prosecuting the child support action,

14  brought Defendant's son with her to meet the Defendant."

15  "Brought the Defendant's son with her to meet the Defendant."

16  Would that work?

17          MR. BUCKHOLTS:  Yes, Your Honor.

18          THE COURT:  Is the Government okay with that?

19          MR. SUEDEKUM:  Yes, Your Honor.

20          THE COURT:  All right.  Thank you.  So I will

21  order that change be made as well.

22          Okay.  And I believe that there are no other

23  objections from either side; is that right?

24          MR. BUCKHOLTS:  That's correct, because as we

25  stated on the restitution, speaking with Mr. Frei, he agrees

1  to that.

2          THE COURT:  And I appreciate that.  The -- let me

3  ask for the Government's -- the Government's position on

4  restitution.  What's the Government specifically asking for?

5          MR. SUEDEKUM:  Your Honor, as set forth in the

6  victim impact statement, we are, on behalf of the victim,

7  requesting $2,080 be ordered in restitution for the

8  Defendant.

9          THE COURT:  Okay.  And so the Government is -- and

10  I thought this was probably where Mr. Buckholts was going.

11  The Government is requesting specifically what the victim

12  asked for in the written victim impact statement, and the

13  Defense is agreeable to that?

14          MR. SUEDEKUM:  Yes, Your Honor.  Based on the

15  Defense's agreement to that, the Government is limiting its

16  request to that amount.

17          THE COURT:  Okay.  Very well.  Is that right?

18          MR. BUCKHOLTS:  That's correct.

19          THE COURT:  Okay.  Very well.  Thank you for that

20  clarification.

21          Okay.  Now, with the changes that we discussed,

22  the Court, absent further objections, will rely upon the

23  presentence report with these changes for purposes of

24  sentencing, and will adopt them based on its independent

25  review and the lack of any further objections, among other

1    things, that we'll adopt the guideline calculations which

2    we'll turn to next.

3             And if we look at the guideline calculations, an

4    important feature of it is the determination that there are

5    four separate groups, and we're going to go one by one.

6             And the Court notes that really, Groups 1 and 2

7    end up with the identical adjusted offense level subtotal

8    that's going to drive this, of 38.  But Count 1, Count 5, and

9    Count 6 go into Group No. 1, and that group has an adjusted

10   offense level of 38 because the base offense level under

11   2G2.1(a) is 32.  Two levels are added because the offense

12   involved a minor victim who had attained the age of 12 but

13   had not attained the age of 16 years, and she was close to 16

14   but she was not 16, and so that specific offense

15   characteristic is an appropriate two-level addition.

16            There is another two-level addition because the

17   offense involved the commission of a sexual act or sexual

18   conduct, and that is appropriately added.

19            There is yet another two-level upward adjustment

20   because the instant offense involved the use of an

21   interactive computer service to persuade, entice, induce

22   and/or coerce a minor to engage in sexually explicit conduct.

23   So that's what gets us to the adjusted offense total of 38.

24            Now, Group No. 2 consists of Count 2 and Count 7.

25   And the Court notes that here again, under 2G2.1(a), we're

1  dealing with an offense level of 32, and we have the same

2  trio of two-level upward adjustments that we had for our

3  first group of counts.  And that gets us to an adjusted

4  offense level for this group of 38.

5           Then we look at Group 3, and Group 3, like

6  Group 4, actually is comprised of a single offense.

7           And by the way, for purposes of clarification, if

8  I did not say that Group 1 consisted of Counts 1, 5, 6, and

9  9, I meant to do that.  I might have left off Count 9, but

10  it's got those four counts.

11          But when we return to Group 3, what we see is that

12  we have the sole count of production of child pornography.

13  And again, under 2G2.1(a), that's a base offense level of 32.

14  In this case, though, there's only one two-level upward

15  adjustment, and that's based on the fact that the instant

16  offense involved the use of an interactive computer service

17  to persuade, induce, entice, or coerce a minor to engage in

18  sexually explicit conduct.  So we have an adjusted subtotal

19  of 34 for that single count group.

20          Our final group is another single count group.  It

21  includes only Count 4, production of child pornography.  And

22  the guideline calculations for that are the same as they were

23  for the group in -- excuse me -- as they were for the count

24  in Group 3.  In other words, both of those single-count

25  groups involve production of child pornography.  Each of them

1  involves a base offense level of 32 and a single two-level

2  upward adjustment under USSG 2G2.1(b)(6)(B).

3          So again, as with Group 3, Group 4 has an adjusted

4  subtotal of 34.

5          Now, this is a case where we assign units under

6  USSG 3D1.4(a), and as it turns out, Count -- the -- well,

7  Group 1 and Group 2 have the highest adjusted offense level,

8  and the offense level for them is 38.  Groups 3 and 4 are

9  close enough to that offense level, because they're each 34,

10  that they also constitute a unit.  So we have a unit for

11  Group 1, a unit for Group 2, a unit for Group 3, a unit for

12  Group 4.  So we have a total number of units of four.

13          And that means we take our adjusted offense level

14  subtotal from above.  That's the highest.  That's 38.  We add

15  four levels because there are four units.  That gets us to an

16  adjusted offense level of 42.

17          So then in this case, we are also looking at a

18  chapter for enhancement, and I think it's fair to say that

19  this is an enhancement that the Defense does not believe is

20  improperly applied under the guidelines but is of

21  questionable relevance, in the Defense view, in the 3553(a)

22  analysis, and results in an excessive guideline range.  I

23  think that's where the Defense position is on this.

24          But this Chapter 4 enhancement is set forth in

25  paragraph 68, and I'm just going to read it because it is

significant.  What 68 says is:  USSG Section 4B1.5(b) states
that:  In any case in which the defendant's instant offense
of conviction is a covered sex crime, neither USSG
Section 4B1.1 nor USSG 4B1.5(a) applies, and the Defendant
engaged in a pattern of activity involving prohibited sexual
conduct, then the offense level shall be 5 plus the offense
level determined under Chapters 2 and 3 of the Guidelines
Manual.

And in essence, what we're saying here is that
there's five levels on top of the 42 levels because the
Defendant is deemed to have engaged in a pattern of sexual
activity as defined in Application Note 4(B)(i) to USSG
4B1.5.

That five-level enhancement is not disputed.  That
gets us to an offense level of 47.  But as the Government has
noted and the PSR correctly notes, there is a cap at
Level 43.  The level prior -- the level would be 47 except
it's capped at 43.  We are significantly not dealing with a
downward adjustment for acceptance of responsibility because
the Defendant exercised his right to trial as was his right,
and we don't punish Mr. Frei for doing so.

Instead, the issue is whether he is given an
adjustment because he accepted responsibility.  The answer to
that question is no, it's not the same as punishing him for
exercising his right to trial, however.  So that gives us a

1  final offense level of 43.

2       Now, the way the PSR has set out the criminal

3  history category, we can see clearly the situation.  There

4  are a couple of -- there were a couple of sentences that

5  Mr. Frei had from 1986 that resulted in probationary

6  sentences.  Unfortunately, there were violations of probation

7  that occurred as well, but the offenses are old enough that

8  those offenses do not contribute any criminal history points

9  here.

10       In 2000, we see that there was a conviction for

11  accosting children for immoral purposes.  That may be

12  relevant background for 3553(a) purposes, but it does not

13  result in any points for a criminal history category here

14  based on the age of the conviction.  Then -- which is good to

15  see.

16       There were no convictions until 2016 when there

17  was a conviction in North Carolina State Court for conduct

18  that is -- relevant conduct to the instant offense.

19       Do I understand correctly it's everyone's

20  understanding that we probably had about ten months served in

21  incarceration for which BOP is unlikely to give credit?  Am I

22  reading that or understanding that correctly, Mr. Buckholts?

23       MR. BUCKHOLTS:  Let me double-check.  I believe

24  you're correct.  I just want to double-check, Your Honor.

25       Yes.  Yeah, almost -- it would be probably about

1  12 months, maybe.

2          THE COURT:  Maybe 12?

3          MR. BUCKHOLTS:  Is that -- let me double-check.

4          Yes, Your Honor you're correct.  I was doing the

5  math wrong.

6          THE COURT:  I think that that's -- I think that

7  that's right.  Sort of August -- beginning of August,

8  beginning of June; is that right?

9          MR. SUEDEKUM:  Yes, Your Honor, approximately

10  eight months.

11          THE COURT:  All right.  And would the Government

12  concede that this kind of thing where we have a discharge

13  sentence for which the Government would not believe BOP would

14  afford any sentencing credit -- is the Government with me so

15  far on that point?  BOP's not going to award sentencing

16  credit on this for this --

17          MR. SUEDEKUM:  I think that's correct, Your Honor,

18  yes.

19          THE COURT:  Okay.  And on this issue, and it's --

20  you know, it's interesting because it's written as a

21  departure issue under the guidelines, but unlike the case for

22  undischarged sentences, the provision for discharge terms of

23  imprisonment strangely enough sort of treats this as a

24  downward departure issue rather than a sentence reduction

25  issue.

1          So what I want to say is, under 5K2.23, the Court

2    believes that although this is guideline policy statement

3    stuff only, a downward departure may be appropriate under

4    these circumstances.  The Court, realizing that technically,

5    it's written as a downward departure issue, believes that it

6    would be appropriate to afford, in fact, a reduction in the

7    sentence based on 5K2.23.

8          Does anyone disagree with that approach?

9          MR. BUCKHOLTS:  No, Your Honor.

10          MR. SUEDEKUM:  Your Honor, I understand the

11    Court's perspective on this.  I would note, the conduct that

12    was punished in the North Carolina conviction, there's really

13    only a very small amount of overlap.  The images that were

14    involved in the child exploitation charges there largely did

15    not relate to the same victim, as in our case.  If I remember

16    right, it is for . . .

17          THE COURT:  All right.  So based on, you know,

18    these various images found on the phone that were of other

19    individuals --

20          MR. SUEDEKUM:  Yes, Your Honor.  And candidly,

21    until reviewing the PSR, I had been under the impression that

22    all of the charges in North Carolina did not involve

23    Miss Bushong, and so I think that those sentences all ran

24    concurrently.  And so if you factor in the other images being

25    found, I think the Defendant would have received the same

1   sentence even apart from the conduct relating to

2   Miss Bushong.  But I understand what the Court's concern is.

3           THE COURT:  Okay.  So let me ask you this,

4   Mr. Buckholts.  Does that sound right to you?  Because, you

5   know, I don't want to implicate 5K2.23 if the conviction in

6   North Carolina is not or would not have been within the scope

7   of 5G1.3 because it's really not relevant conduct to this

8   offense.

9           MR. BUCKHOLTS:  This -- we disagree with the

10  Government's assertion that it's not related.  It's our -- in

11  fact, some of it was related.

12          THE COURT:  Let me ask you this, if the parties

13  know:  So we have third-degree sexual exploitation of a

14  minor.  Anyone know whether we're talking about our same

15  minor victim in this case?

16          MR. BUCKHOLTS:  Judge, if I could, on -- this is

17  on page 25 on paragraph 75, if you look on the last paragraph

18  on -- last paragraph of paragraph 75 -- I know that's a

19  little -- T.B. is identified as one of the counts on there.

20          THE COURT:  So that presumably is -- yes, the

21  reference here is to "Our T.B.", "Our victim, T.B."  Is that

22  fair to say?

23          MR. BUCKHOLTS:  Yes.

24          MR. SUEDEKUM:  Yes, that's what the PSR says.

25          And, Your Honor, I want to clarify something I

1  said a moment ago.  The sentences on those four different

2  warrants were six months' custody to be served consecutively

3  on each, it appears.

4          THE COURT:  Consecutively, which is --

5          MR. SUEDEKUM:  And so, Your Honor, just going

6  through the individual charges that are listed, the first is

7  a minor female who is 10 to 11 years old.  The second, a

8  minor female who is 3 to 4 years old.  The third, a minor

9  female who is 3 to 4 years old.  It's only the fourth charge

10  that relates to the victim in our case.

11          And Your Honor, I would submit that that would be,

12  at most -- that if the Court were inclined to be concerned

13  about the discharge term of imprisonment, it would be, at

14  most, the six months, assuming that the six months related to

15  our case.  The other up to 18 additional months would have

16  related to unrelated conduct, Your Honor.

17          THE COURT:  Okay.  All right.

18          Now, I can see it looks like there are -- yeah, I

19  guess it's laid out that there are various other victims.

20  And if you look at the situation, the situation with the

21  victim in our case is part of it, but only one part.

22          Anything else on that point?  The Court will have

23  this situation in mind when it pronounces sentence.  Anything

24  else that you had?

25          MR. BUCKHOLTS:  No, Your Honor.

1      THE COURT:  All right.  Thank you.  So I

2  appreciate that.

3      Now, what I want to do is ask this:  I had brought

4  that up because it is actually sort of listed -- again, kind

5  of strange manner -- as a departure issue when really it

6  probably should be a sentencing credit issue and identified

7  as such in the guidelines, just like 5G1.31 is -- excuse

8  me -- 5G1.3 is.

9      But that leads to the next question.  Are there

10  any other departure issues?  In other words, either side have

11  a downward departure motion?  I'm not aware of any.

12  Mr. Suedekum?

13      MR. SUEDEKUM:  No, Your Honor.

14      MR. BUCKHOLTS:  No, Your Honor.

15      THE COURT:  Okay.  All right.  So here's what I'm

16  going to do then.  Absent downward departure motions, we have

17  the same predeparture and post-departure guideline ranges,

18  and they are as follows:  The guideline provision for custody

19  is a sentence of life in prison.

20      Now, the Court is aware of the statutory mandatory

21  minimums where they apply.  It's aware of the statutory

22  maximums for each count.  There is one count that does

23  authorize life in prison, only one, but there is one.  The

24  guideline provision is life even though, on seven of the

25  eight counts of conviction, a life sentence would not be

1    authorized as a matter of statute.

2            We look at the guideline range for a term of

3    supervised release.  As with the statute, the guideline

4    provision calls for a term of supervised release of a

5    mandatory minimum of five years up to life.  So the mandatory

6    minimum by statute is five years, the maximum is life.  The

7    guideline range is also five to life.

8            Probation is not a possibility either under the

9    statute or according to the advisory guideline provisions.

10   But statutorily, that's just not a possibility anyway.

11           Our fine range is from $50,000 to $250,000.

12   Restitution, in a case like this, is as determined by the

13   Court, and the Court believes that it has received an

14   agreement between the parties that the amount of restitution

15   should be ordered in the amount of $2500 to T.B.

16           But the guideline provision is that it's something

17   to be determined in the discretion of the Court.  Special

18   assessment of $800 is mandated by statute and also called for

19   by the guidelines.

20           In this case, under the guidelines, the JVTA

21   assessment is not applicable because of the indigent status

22   of the Defendant.  It would be $5,000 if the Defendant was

23   not indigent.

24           So those are the guideline ranges in this case.

25           Are there any objections to the guideline ranges

1  as just pronounced?

2          MR. SUEDEKUM:  No, Your Honor.

3          MR. BUCKHOLTS:  None to the guideline ranges, Your

4  Honor.  I thought you said 2500 on the restitution?  I think

5  it was $2,080.

6          THE COURT:  Oh, I thought I said 2,050.  Is it

7  2,080?

8          MR. BUCKHOLTS:  2,080, yes, Your Honor.

9          THE COURT:  All right.  So when the time comes for

10  that, I stand corrected.  2,080.  Okay.  Thank you.

11          Now, the Court notes that obviously, both in terms

12  of mandatory minimum sentences here -- and the largest

13  mandatory minimum sentence we have is 15 years -- and the

14  largest maximum penalty of life imprisonment, you know, the

15  mandatory minimum and the life imprisonment maximum, we're

16  dealing with very significant sentences.

17          The Court realizes that the guideline provision is

18  for a term of life, but the Court, under 3553(a), depending

19  on the application of the applicable sentencing standard,

20  could impose sentence anywhere between 15 years up to life.

21  And it's the Court's job to pronounce a sentence that is

22  sufficient but not greater than necessary to serve the

23  recognized purposes of federal sentencing, and so if it's, in

24  the Court's judgment, 15 years or lower, we'd be looking at

25  15 years.  If the Court were to determine that the

1  appropriate sentence was life, then the Court's duty would be

2  to impose a sentence of life.  But it does realize that the

3  guideline sentence of life is advisory only.

4          The Court, in applying the sentencing standard of

5  3553(a), needs to consider a variety of facts and

6  circumstances including the nature and circumstances of the

7  offenses of conviction, the history and characteristics of

8  the Defendant, the need for the sentence imposed to do

9  certain things: reflect the seriousness of the offense,

10  promote respect for the law, provide just punishment for the

11  offense, afford adequate deterrence, protect the public from

12  further crimes of the Defendant, provide the Defendant with

13  needed educational or vocational training, medical care, or

14  other correctional treatment in the most effective manner.

15          The Court also needs to consider the kinds of

16  sentences available.  And here, that means a couple of

17  different things.  One, the Court is not faced with a

18  decision it sometimes has, whether to go with a probationary

19  sentence, because that's not an option; but it is faced with

20  the option of life imprisonment versus a term of imprisonment

21  of 15 years or more.  The Court is aware of that.

22          The Court is aware of the need to consider

23  pertinent policy statements from the Sentencing Commission.

24  5K2.23 is one that comes to mind as a pertinent policy

25  statement.

1    The Court needs to consider the need to avoid

2  unwarranted sentencing disparities amongst Defendants with

3  similar records who have been found guilty of similar

4  conduct, and the Court will have that in mind, understanding

5  that it's not always possible to identify perfectly similar

6  cases.

7    But there are ways to consider this Defendant as

8  falling into a certain criminal history category the same as

9  other Defendants, and having been found of the same general

10 category of criminal conduct.  The Court, at least, can do

11 that.

12   The Court also needs to consider the need to

13 provide restitution to any victims and intends to do so with

14 what is essentially a stipulated order of restitution.

15   So the Court has all these things in mind.  It has

16 also, in addition to reviewing the parties' briefing in some

17 detail, it has done some of its own homework related to what

18 kind of sentences we're seeing out there for these kinds of

19 offenses.  And I'm intending to talk about that in some

20 detail.  That is part of the Court's analysis.

21   So I'm going to start by asking the parties

22 whether they wish to offer any evidence.  Mr. Suedekum, any

23 evidence from the Government?

24   MR. SUEDEKUM:  No, Your Honor.

25   THE COURT:  All right.  Thank you.  Mr. Buckholts?

1      MR. BUCKHOLTS:  No, Your Honor.

2      THE COURT:  Okay.  So that gets us to the point

3  where it's time for counsel to make their remarks in addition

4  to whatever they said in their filings.  They may say what

5  they wish here.  I will say it's this Court's practice to

6  allow a Defendant who wishes to allocute to do so either

7  before or after counsel argue.

8      Mr. Buckholts, does Mr. Frei have a preference?

9      MR. BUCKHOLTS:  Your Honor, he would like to

10  allocute, but I would like to make some statements before and

11  maybe a few after he allocutes, if necessary.

12      THE COURT:  All right.  Thank you, Mr. Buckholts.

13      All right.  So here's how we'll proceed then.

14  Mr. Suedekum or Ms. Risinger may go first, then Mr. Buckholts

15  can make his remarks, then Mr. Frei can allocute.  If

16  Mr. Buckholts wishes to follow up, he may do so.  If he does,

17  then the Government may make any remarks it feels fit to make

18  within the scope of Mr. Buckholts' last comments.  All right?

19      MR. SUEDEKUM:  Thank you, Your Honor.  I know this

20  was included as a part of the presentence report, but I do

21  want to, on behalf of the victim, read her victim impact

22  statement into the record since she's not here today.

23      THE COURT:  Sure.

24      MR. SUEDEKUM:  (As read):  Your Honor, what had

25  happened to me affected me emotionally in a few ways that I

didn't realize it would affect me so much: the consistency of
having panic attacks or getting really anxious because of
small trigger factors that would make me think back to what
happened; the noise of thunder or being near a park, for
example, would make me think of this; or just sitting there
alone by myself and just thinking about it would easily cause
me to start panicking.  And it had gotten to a point where it
was affecting me in my classes, that I would have to leave
and go sit in a counselor's office until I was calm.

      I would start having nightmares at night.  It
would cause me to wake up shaking and crying and not being
able to go back to sleep or make it hard to fall back asleep
because of how I was feeling.  The panic attacks, being
anxious constantly, the nightmares, all combined together
because of one thing that had happened to me, just started
making things difficult or exhausting; consistently being
stressed all the time about it, just wishing that it would
all just go away instead of partly taking control of things.

      I would also like to request some sort of
restitution in this matter for my future counseling:  $40
co-pay each week for a year for a total of $2,080.  I hope
you can consider this.

      Thank you, Taylor Bushong.

      Your Honor, I'm not sure whether Miss Bushong has
gotten any counseling up to this point.  But I would submit

1   that victim impact statement, I'm not sure that she has

2   really even fully begun to be able to process or deal with

3   the trauma that the Defendant's actions have caused her and

4   the long-term effects that she is going to feel as a result

5   of this case.  And I know that the Court was able to observe

6   Miss Bushong's testimony during trial and was able to observe

7   her.  And I -- sorry, Your Honor.

8               THE COURT:  Take your time.

9               MR. SUEDEKUM:  I do want to talk for a minute

10  about the Defendant's argument requesting a variance

11  regarding the five-level enhancement for a repeat offender.

12  And specifically, I want to address the *Bruffy* case that the

13  Defense argues was a basis for considering a downward

14  variance.  And in comparing the trauma and impact to

15  Miss Bushong as well as just comparing it to the facts of the

16  *Bruffy* case, I thought it was interesting.  I don't know if

17  the Court had an opportunity to review the *Bruffy* case.

18              In that case, Your Honor, the Court believed that

19  the repeat offender enhancement overstated the Defendant's

20  conduct, and it actually granted him a variance back down but

21  ultimately still sentenced him to 23 years in prison.  And as

22  I reviewed the facts of that case, Your Honor, I couldn't

23  help but notice the stark difference between the factual

24  basis that led to Mr. Bruffy receiving a 23-year sentence and

25  the conduct of the Defendant in this case.

1    In the *Bruffy* case, Your Honor, the Defendant pled
2  guilty.  There was no trial.  He accepted responsibility for
3  his actions.  As the Court noted, there was no sexual
4  intercourse or sexual contact with the victims.  There were
5  only two counts of possession of child pornography.  Both
6  counts involved the victims who were unaware that videos were
7  being taken of them.  The Court noted that those images were
8  not distributed and that as far as the Court was able to
9  determine, it did not appear there was any trauma to either
10  of the victims in that case.

11    Your Honor, with respect to each of those factors
12  which the Court found significant in *Bruffy*, I can't help but
13  notice the stark contrast to the facts of the case here.  In
14  this case, Miss Bushong was obviously aware.  She was a
15  participant in the conduct Mr. Frei had her engage in.  She
16  wasn't asleep.

17    I believe she has been traumatized by this.  She
18  talked about in her statement the effects that she has
19  already felt and her need for counseling in the future.

20    As set forth in our memorandum, there is evidence
21  that those images of Miss Bushong were distributed.  The
22  Defendant, in speaking with detectives when he -- when his
23  home was searched as well as through the course of the
24  investigation, there was evidence that the Defendant
25  distributed images both of Miss Bushong and possibly of

1    others.

2          And so, Your Honor, on behalf of the Government,

3    we don't believe it's appropriate to grant a downward

4    variance, really for two reasons.  First, because the

5    Defendant's conduct did involve repeated acts of sexual

6    exploitation.  And the Defense's comment was that it's over a

7    fairly limited time period and only involved one victim.  But

8    they acknowledge that the enhancement, on its face, applied.

9          And while this conduct may have only spanned

10   approximately one month, it is really undisputable that there

11   were separate instances, initially just simply by reaching

12   out to and beginning the grooming process of Miss Bushong

13   online, but there were multiple trips, multiple distinct

14   trips beginning on May 8th and spanning up to at least a

15   month later into early June, at least three trips which the

16   Defendant was charged and convicted of traveling from North

17   Carolina to Tennessee and, on each of those occasions,

18   engaging in sexual contact and/or taking photographs and

19   videos of those images.  And so we do believe that that

20   enhancement is properly applied.

21         Same argument is true for the -- the Defendant's

22   same argument regarding the grouping, the additional levels

23   added for grouping.  These are based on a proper application

24   of the guidelines.  Enhancements are warranted in this case.

25   And we do believe, Your Honor, we requested a sentence of

1  life imprisonment because it is the guideline sentence in

2  this case.  In fact, as we noted and the Court noted as well,

3  Mr. Frei's offense level is actually higher than a 43, but

4  the guidelines simply do not contemplate a higher offense

5  level, and I think that speaks to the severity and the

6  pervasiveness of his conduct.

7          And so we do believe that a life sentence is

8  appropriate in this case to reflect his actions, the impact

9  that his actions have had upon the victim, and are especially

10  warranted in this case, Your Honor, to provide for deterrence

11  both to the Defendant as well as more generally to other

12  individuals who might seek to take advantage of vulnerable

13  individuals like Miss Bushong.

14          These laws exist for a reason, Your Honor.  It's

15  not hard to understand the need to protect vulnerable

16  populations, especially children, from this type of conduct.

17          Again, as the Court is well aware from sitting

18  through the trial, this was not simply a situation where

19  Mr. Frei was in possession of child pornography.  And even

20  possessing child pornography itself is a serious crime.  But

21  the Defendant's the one who produced the child pornography in

22  this case.  He's the one that enticed Miss Bushong to let him

23  travel to meet with her.  He's the one that created these

24  images and then preserved them on his phone.

25          And there was also evidence that the Court heard

that the Defendant continued to re-access this material and was taking additional screenshots of the videos he had previously created.

I think, as -- it's really set forth in the PSR, but this, again, goes to the Defendant's characteristics, his mind-set, his attraction to and interest in minors like the victim in this case. And so for all those reasons, Your Honor, we do request a sentence of life imprisonment.

THE COURT: Let me ask you a couple of things, Mr. Suedekum. One is, you know, on the -- on the issue of the four-level enhancement for the units, multi-count adjustment, and the five levels under 4B1.5(b), is there an argument to be made that really, both of them get at the same problem, which is that there is, in the words of the *Brattain* case from the Sixth Circuit cited in 2008: To make sure that a sentence adequately takes account of the frequent occurrence of repeated sexual abuse against a single child victim and the severity of the harm to such victims from the repeated use.

It does seem to me the argument can be made, look, the only reason you have the multi-count adjustment is these different counts are picking up different instances. That's why you have the four-level adjustment. And in that sense, it's not the five-level based on the same policy rationale, sort of double accounting for a single concern.

1          MR. SUEDEKUM:  Well, Your Honor, I think they

2    both -- they're both certainly related to one another.  I

3    think that's really beyond dispute.  What I would note is

4    that the grouping and the additional units is based on the

5    counts of conviction and based on the Sentencing Commission's

6    belief that where someone is convicted of one crime and

7    someone who is convicted of three crimes, that the guidelines

8    should take account of the fact that an individual has

9    committed more than one crime when they are being sentenced.

10          I do think that the separate enhancement under

11    4B1.5 addresses a slightly different issue and that it is

12    addressing someone not only who has committed crimes but is

13    repeatedly targeting specifically, in this case, a vulnerable

14    individual or, in other cases, perhaps multiple victims.

15          In looking at the *Brattain* case, the Court was

16    careful to note -- the Sixth Circuit was careful to note that

17    the District Court had actually erred in not applying the

18    enhancement because if the factual circumstances are met, as

19    they are here, that it is appropriate to apply that

20    enhancement.

21          Now, if the Court wanted to consider the

22    application of the two of those guideline provisions jointly

23    as to how they impact the Defendant's guideline range, I

24    would submit, Your Honor, that because the Defendant's total

25    offense level is a 47 and it is being reduced back to a 43

1   for purposes of a guideline range, he's really not suffering

2   or being punished twice in any event because the full effect

3   of those guidelines aren't even being applied to him simply

4   because his guideline range is already so high.

5          THE COURT:  Let's say you had 47 minus the 5.

6   Let's say if you did, and if you were the Court, of course,

7   the guideline offense level is 43, which is life.  But if the

8   Court was to say, well, you know, even though that's

9   technically correct, you know, it seems like the five levels

10   is, you know, sort of getting at the same concern and,

11   therefore, I don't need to, de facto, sort of count both when

12   sentencing.  We'd be looking at 47 minus 5, then, to get you

13   to 360 to life.  Fair to say?  Like, that's what it would be

14   rather than 43 minus 5.  See what I'm saying?

15          MR. SUEDEKUM:  Certainly, Your Honor.  I think

16   adding them together, the Court calculates a total offense

17   level, and then if the offense level falls above 43, then the

18   Court brings the total offense level back to a 43 for the

19   purposes of the guideline calculation.

20          I would again, Your Honor, note that the

21   difference between the production counts which involve the

22   production of child pornography versus the separate counts

23   and the separate charges for the sexual exploitation, the

24   sexual abuse, engaging in sexual conduct repeatedly with the

25   victim in this case, Your Honor, I -- I believe I have the

PSR here -- but the guidelines are really driven by the child production counts.

And so I do believe it is fair to say that there is still separate conduct that is being reached by the two different guideline provisions that are operating there.

THE COURT: Let me ask you along the lines of thinking about this case more generally. I mean -- and there are many ways to, I think, look at the kind of egregious misconduct we saw here, right? Lots of different ways to look at it. One way is to say if you're looking at the two primary thrusts of what went wrong, one is the production of child pornography which is, as you say, a very serious crime. And another is the sexual contact, the actual sexual contact. The -- and, you know, one of the -- at least one of the counts talks about -- I think two of them talk about the predicate crime of statutory rape and, in fact, aggravated statutory rape under Tennessee law.

And one way of thinking about it, two big buckets that are the primary wrongs in this case, those two things. The predicate offense of aggravated statutory rape, one of the things the Court has in mind is that if I understand correctly, it's a Class D felony in Tennessee, so the -- the maximum possible sentence for statutory rape, no matter what your criminal history, let alone in the lower category that Mr. Frei is in, but it is 12 years.

1          So one of the things the Court has in mind,

2     understanding it's not bound by state -- you know, state

3     policy decisions about the maximum sentence, but in a very

4     serious sentencing question like this, whether someone is

5     going to get life in prison or something closer to what the

6     Defense is asking about, you know, if we see -- if we start

7     to look at the -- the wrongs involved, and maybe look at

8     them, even if we say, you know what?  He deserves the maximum

9     penalty, in essence, for statutory rape and, in essence, a

10    severe sentence for child pornography.  If you -- even if you

11    put those two things together, you're not talking about, you

12    know, a sentence of life in prison or 35 years or something;

13    it's going to be something a little bit less.

14         And so I guess my question for you is, if I look

15    at the substance of this as involving two very serious

16    wrongs, each of which is worthy of a harsh punishment, how

17    could I be sure that going above, let's say, 30 years is not

18    overkill?

19         MR. SUEDEKUM:  Your Honor, I think one of the ways

20    that you can begin by doing that is beginning by going back

21    to the guidelines.  The guidelines are designed to take

22    account of a variety of different conduct in order to help

23    assure that the individual is not being treated solely by

24    virtue of the offense, but based on their actual offense

25    conduct and what they are accused, and in this case

1  convicted, of having done.

2         One thing that I would take issue with, Your

3  Honor, is that with regard to child pornography, I believe

4  the starting point would be 15 years, and so not simply that

5  15 plus 12 would be to -- in the range of 27, but I think

6  that's really just a starting point.

7         THE COURT:  Yeah, right.  I think that's fair to

8  say.  So you would have 12 -- so you'd be up to 27.  So you

9  could have, you know, a pretty severe sentence on both of

10  those, though, and you're still maybe not looking at life.

11         MR. SUEDEKUM:  That's fair, Your Honor.

12         A couple of additional facts that I would point

13  out to the Court are the -- one, this is not merely a case --

14  and I don't mean to understate the seriousness of the

15  production of child pornography.  This is not merely a case

16  where the Defendant created child pornography.  This is not

17  merely a case where he engaged in aggravated statutory rape

18  of a minor.  The Defendant sought out a 15-year-old girl on a

19  Facebook chat room for teenagers.  And the Court saw the text

20  messages.  They were -- the Facebook messages.  They were

21  entered at trial.

22         There was a grooming process.  There was an

23  enticement, a solicitation period where the Defendant is

24  really the one who led the victim and was able to entice the

25  victim to engage in this conduct.  And so I understand the

1  Court's point.  There is the initial online solicitation of a

2  minor, and it was certainly knowing, is what the evidence

3  showed at trial.  There was no dispute that the Defendant not

4  only knew that the victim was 15 years old, but that appeared

5  to be what he was attracted to about her was the fact that

6  she looked so young.

7  In addition to the solicitation, there was the

8  interstate travel to engage in a prohibited sexual act, there

9  was the actual illegal sexual act that he engaged in with the

10  victim, and there was the creation of child pornography.

11  In addition to all of those things, Your Honor, as

12  we discussed a moment ago, the Defendant did this multiple

13  times over the period of a month; at least three trips for

14  which he was convicted of traveling from North Carolina to

15  engage in illegal sexual activity and producing visual

16  depictions of it.

17  And so while perhaps it might be easier if it were

18  one count of production of child pornography and it were one

19  count of engaging in an illegal sexual act, it might be

20  easier to put together those two charges and say what would

21  seem like a fair sentence here.  I do think that the repeated

22  acts the Defendant engaged in over a prolonged period, even

23  just with respect to Miss Bushong, we are talking about

24  roughly a month.  Not something that just happened one night

25  or out of the blue or somehow, you know, a mistake or a lapse

1    in judgment.  Over a month just with Miss Bushong.

2              All of those factors, Your Honor, I think show why

3    the guidelines place the Defendant at a guideline range of

4    life imprisonment, because of the repeated nature of his

5    conduct.  And so that is why we've requested the sentence of

6    life imprisonment, and we do think it is appropriate in this

7    case, Your Honor.

8              THE COURT:  All right.  A couple of more

9    questions, and I appreciate the dialogue.  One is the

10   Government's argument about unwarranted sentencing disparity.

11   And I see what it's saying.  But fair to say the Government's

12   argument there doesn't actually address the disparity that

13   3553(a) is expressly addressed to, which is disparities

14   amongst defendants with similar records convicted of similar

15   conduct.

16             It's -- you're talking about the disparity

17   between, as I see it, the offense level he received under the

18   guidelines and the offense level he could have received.

19   That's really the -- right?  Because I think the argument

20   there is he -- look, he ended up with an offense level of 43;

21   could have had an offense level of 47.  That seems to be what

22   this argument is.  And that argument has various, I think,

23   applications.  I understand that.  But it's not really

24   addressed to whether a sentence of life imprisonment would be

25   disparate compared to other offenders convicted of similar

1    conduct and similar records.

2         MR. SUEDEKUM:  No, Your Honor, I wasn't purporting

3    to say sort of what the national average is regarding these

4    types of offenses.  My point was more that in sticking closer

5    to or at the guidelines, by default would be -- sticking

6    within the guidelines meaning I did address the *Bruffy* case

7    just because I do think it is instructive to see a Defendant

8    who is not alleged to have engaged in sexual conduct with the

9    victim.  The Defendant who took images, all the victims were

10   asleep, who were not personally impacted or traumatized by it

11   because they weren't aware the photos were taken; even

12   setting aside those differences which I think make the

13   Defendant's conduct in this case much more severe, that type

14   of Defendant, charged with a total of three counts, received

15   a 23-year sentence.

16         And I do think -- I understand, Your Honor, that

17   from 23 years to life, that it's still a wide range, but I do

18   think it is instructive to see that even in that type of

19   case, a Defendant still received a 23-year sentence and shows

20   the need for an even more lengthy sentence for the Defendant

21   in this case.

22         THE COURT:  All right.  I appreciate that.

23         One final issue is this:  So if the Government is

24   asking for a life sentence, as it notes, that's the guideline

25   sentence.  And this Court does not strive to pronounce a

1  reasonable sentence; it strives and it needs to pronounce a

2  sentence sufficient but not greater than necessary to achieve

3  the recognized goals of sentencing.

4         But the fact remains that as a guideline sentence,

5  a sentence of life would be presumed reasonable on appeal

6  which is, again, not what the Court looks at.  So -- not what

7  the District Court looks at.  And so I'm not saying that the

8  Government is doing anything unreasonable in asking for the

9  life sentence.  It's a guideline sentence.

10         But one question that I do have is this -- well,

11  one observation and one question.  Life, in addition to being

12  the guideline sentence here, is also, of course, the

13  statutory max and really the constitutional max, right,

14  because there is no death penalty for crimes other than

15  murder essentially, right?

16         MR. SUEDEKUM:  Correct.

17         THE COURT:  So should there be a concern that this

18  is the very most serious sentence that could be imposed, what

19  the Government's asking for, and we are dealing with the

20  Defendant who, you know, for example, he's in the lowest

21  criminal history category.  He is at a -- and I don't think

22  there's any question about that.  I don't think there's any

23  question that his risk of recidivism upon release from a

24  lengthy term of imprisonment would be lower than some other

25  offenders even though maybe age doesn't diminish a sex

offender from these kinds of crimes of prey. Age may not diminish the risk for sexual offenders the same way it does some other kinds of crime.

We are dealing -- if you look at the facts, could the facts be worse? It's terrible facts, right? It's terrible. Could they be worse? Well, you can imagine them being worse. The person could have been younger. This is a very -- this is a minor victim, extremely naive, I think it's fair to say anyone would say, for her age. And I'm not minimizing that at all, but to say you could have -- you could have an even more vulnerable younger victim.

And so I guess what I'm saying is, pointing out circumstances, particularly regarding criminal history and age of the victim where we could be dealing worse with -- we could be dealing with worse facts but we can't have a worse sentence.

And so, you know, how does the Court know that the very highest sentence possibly imaginable under our system should be imposed here when, you know, we don't necessarily have the worst offender? And I don't know -- and I think that's a question the Court has, and I -- if there's anything else you wish to say -- and obviously you've set forth the Government's basis for its position under the law, under the guidelines, under a very egregious set of facts, and if there is anything else you wish to say on that, I'm happy to hear

1   it.

2          MR. SUEDEKUM:  Your Honor, I suppose it's almost

3   always possible to construct or come up with a worse set of

4   facts.  And I don't believe this is what the Court was

5   saying, but I don't know that a defense or a response of "It

6   could always be worse" is necessarily really anything in

7   favor of a more lenient sentence.

8          What I would say in response to the Court's

9   concern is that I would note that I do think there is a

10  serious need for not only general deterrence, that -- to the

11  extent that, you know, individuals who are out there in the

12  public might not look at a, you know, United States Code book

13  and see the penalties that are out there and what they might

14  be facing for engaging in certain conduct.

15         They might read a newspaper.  They might read a

16  press release.  And seeing the seriousness and a significant

17  sentence for this type of conduct, which is -- the Court is

18  fully authorized to do by issuing a life sentence, would send

19  a message to the community about people who had engaged in

20  this type of conduct, whether it be with a 15-year-old,

21  whether it be with a 5-year-old.

22         I would say, Your Honor, that the fact that an

23  individual, the victim could have been younger, it's

24  certainly a factor.  I would note -- and the Court heard the

25  victim's testimony in this case.  She was especially -- even

1    though she was 15 years old at the time, there were a number

2    of factors, there were a number of things going on in her

3    life that made her especially vulnerable.

4              THE COURT:  Not least of which -- and this kind of

5    thing isn't lost on the Court.  You know, I do think there

6    was this extreme naivety, and I don't mean that in a

7    pejorative way at all.  And unfortunately, some of our

8    youngsters approaching 16 are very active sexually, and

9    this -- and that's not a defense to anyone of Mr. Frei's age

10   acting sexually towards them.  It is to say that someone with

11   some -- with sexual experience maybe has a way to at least

12   attempt to cope with these advances in a way that this victim

13   was unable to do so because she was extremely naive, even for

14   her age.

15             Not, you know, I mean, because she was -- again,

16   there are lots of girls her age, unfortunately, who are

17   sexually active.  She was not one of them, and that's not

18   lost upon the Court.  She had said she had told him that she

19   had kissed a boy once, and it sounds like it was some peck on

20   the lips or something; and this vulnerability, even though

21   she wasn't younger, is not lost on the Court, and so I get

22   what you're saying there.

23             MR. SUEDEKUM:  And then finally, Your Honor, I'll

24   wrap up, but I do want to note that in addition to general

25   deterrence, I do think there is a serious need for specific

1  deterrence in this case.  And we laid out part of that and

2  some of the background in our sentencing memorandum as it

3  pertains to this Defendant.  This was not a onetime thing.

4  The Defendant had hundreds of images of underage children,

5  girls, boys, on his phone.

6          He admitted, in the August 3rd interview, he had

7  spoken to other underage people, that he attempted to meet

8  with them.  This was not a one-off occurrence both as it

9  related to Miss Bushong but also more generally to the

10  Defendant's mind-set.  And in trying to factor in and weigh

11  the Defendant's history and characteristics, I do think it is

12  important to take stock of that, because that really doesn't

13  come through in the guideline calculations but, I think, is a

14  specific factor that relates to the Defendant and the

15  possibility that this Defendant, regardless of what the

16  statistics may say, that this Defendant might be likely to

17  re-offend.

18          Even during his interview with Detective Adkins

19  when that search warrant was executed at his home -- and we

20  discussed this briefly and -- in the *Miranda*, that the

21  Defendant didn't seem particularly apologetic about the fact

22  that he was reaching out to and discussing sex, sexual

23  activities, with a minor.  It was almost simply the Defendant

24  had a disagreement about the laws that we have in the United

25  States.

```
1          Whatever that disagreement, it certainly doesn't
2   entitle someone to disobey them, and so I think there is a
3   need for specific deterrence in this case as it relates to
4   the Defendant to protect the public, to protect people like
5   Miss Bushong, whether it is because they are particularly
6   vulnerable, whether it's because they are naive, whatever the
7   reason may be, that there is a need to protect the public
8   from the Defendant.
9          THE COURT:  All right.  Very well.  Thank you very
10  much, Mr. Suedekum.
11         So Mr. Buckholts, if you wish to make your
12  remarks.
13         MR. BUCKHOLTS:  Yes, Your Honor.  Thank you.
14         Your Honor, I first want to address for sentencing
15  for the 3553 purposes really the individualized factors under
16  3553(a) for Mr. Frei, sort of tie these together hopefully
17  for the Court in trying to come up with a sentence that's
18  sufficient but not greater than necessary to meet all of the
19  sentencing goals.
20         Now, in the brief, as Your Honor's seen, the -- a
21  big factor that Mr. Frei focused on was not only his age upon
22  release which are related to some of the factors in all --
23  really, to some extent, all of the sentencing factors, but
24  more along the lines of the factor with disparity in
25  sentencing and the likelihood of an offender committing
```

1    crimes again upon release.

2         So I went back through the PSR and his history,

3    and as the Court is aware, he didn't have an easy childhood.

4    He was in a lot of foster homes, bounced around from

5    different homes, didn't have any stability.  Notwithstanding

6    that, he still had some positive aspects in his history,

7    especially his work history and military history.  He was

8    able to still achieve things in life notwithstanding those

9    challenges, and I cited some statistics.  A lot of defendants

10   that come before this Court, as we see on a regular basis, do

11   fail out, you know, that are -- grow up with very difficult

12   challenges as kids.

13        THE COURT:  Let me ask you this about military

14   history.  I saw the Probation Office could not confirm this.

15   And, of course, I don't know whether he served or not.  But

16   what should I think about that, the fact that there,

17   according to Military, there was no record of his service?

18        MR. BUCKHOLTS:  Well, and we've spoken with

19   Mr. Frei about that.  And a lot of his records are, you know,

20   difficult to get from -- Probation wasn't able, you know, we

21   weren't either.  His phone was confiscated and things like

22   that.  I would say this, though, because I thought about that

23   before.  There were some things that as far as job history,

24   of course, we, a lot of times, get back, you know, unable to

25   confirm certain jobs.  But there were some of the jobs that

1  were confirmed.  And there's also a sort of employment gap

2  there around the time that he would have been 18 years old to

3  about 22.

4          And so, you know, I think the Court -- understand

5  the Court might look at that as how much weight to give that.

6  But I would just ask the Court to consider that, to give it

7  appropriate weight, notwithstanding the lack of verification,

8  and not necessarily assume that, well, he must be lying he's

9  a military.  You know, I'm not experienced with how that

10  works.  I know we send off for records sometimes and have

11  trouble getting things back to verify.

12          THE COURT:  Yeah.  Yeah, it's hard to know why

13  there was no record.  Yeah.

14          MR. BUCKHOLTS:  The -- as far as -- another thing

15  that I highlighted in characteristic about Mr. Frei was the

16  lack of substance abuse, which I also would tie into --

17  should tie in, presumably tie into his ability to receive

18  treatment and be successful on supervision and treatment upon

19  some release at some date in the future.  As the Court is

20  aware, I don't think that I would need to -- I'm sure there's

21  plenty of anecdotal evidence.  I didn't cite any statistics

22  specifically on the substance abuse, but I know anecdotally,

23  many Defendants, when they're coming up with violations,

24  almost all of them -- I don't know; maybe that's an

25  overstatement -- but many of them are related to substance

1   abuse issues.

2          So that -- that factor in his background is

3   also -- should work in his favor, and I would ask the Court

4   to consider it.

5          As far as his age, if he were to receive -- the

6   Court were to give him a 15-year sentence which is the

7   mandatory minimum statutory sentence that the Defense is

8   requesting, he's not going to be a young man upon release.

9   He will be 51 years old this February 10th, I believe.  And a

10  lot of things can happen in a decade in somebody's life or a

11  decade and a half.

12         A 15-year sentence would -- considering

13  individualized, if the Court is looking at retribution as a

14  factor or even -- I don't think that that is really there for

15  deterrence rehabilitation.

16         Or if the Court is looking at focusing in on what

17  about the goal of retribution or the goal of incapacitation,

18  that could be a 15-year sentence, could be a life sentence.

19  I mean, we don't -- especially in prisons when people's

20  lives, the standard of living and the mortality rates, I

21  believe there are studies that they do go down in -- when

22  people are imprisoned.

23         So for those purposes, retribution and

24  incapacitation, a 15-year sentence would still be a

25  significant sentence to meet those -- to meet those goals.

1        Criminal History Category I, as the Court has
2  already talked about that a little bit before, he's not a --
3  he's at the lowest level of a criminal history category as
4  well.  The -- of course, a lot of the data sided with just
5  generalized aging out with retribution and, you know, some of
6  the -- the worst that I found for the worst recidivism were
7  the firearms and violent offenses, you know.  Those were
8  usually on the higher end.

9        And so the BOP is keeping up with, you know, some
10  data on those issues to try to educate the public and the
11  Courts, and the U.S. Sentencing Commission is doing a -- has
12  done multiple studies.

13        I also noted in the brief that the U.S. Sentencing
14  Commission has made certain recommendations to Congress.  And
15  to my knowledge and awareness, Congress hasn't seemed to act
16  on these.  And these statutes, as the Court pointed out, the
17  driving guideline offense is the production.  I think the
18  Government acknowledged that in its statements.

19        Base level 32 carries a mandatory minimum of 15
20  years but a cap at 30 years.  The Count 7 enticement cap has
21  a mandatory minimum of 10 years, but a statutory maximum of
22  life.  And I believe --

23        THE COURT:  As far as the Count 5?

24        MR. BUCKHOLTS:  I'm sorry.  Was that -- could have
25  been Count 5.  I may have misstated.  It was the enticement

1    count.  If I could have one moment so I don't make a mistake

2    which count that was.

3            Yes, Your Honor.  I'm sorry.  It's Count 5, 18

4    United States Code, Section 2422(b), which the base level on

5    that one, if I'm not mistaken, starts out lower.  It starts

6    out 28 rather than 32.  So you've got really the highest

7    driving guideline in production counts.  And so it -- it

8    doesn't make total logical sense that Congress would say this

9    offense carries a maximum of 30 years.  But the guidelines

10   started out at a base level 32; and another offense, it

11   carries a maximum of life, and so --

12           THE COURT:  It's also a little strange -- and I

13   could see ways to reconcile it -- but that the offense that

14   has a much higher statutory maximum has a lower mandatory

15   minimum.

16           Now, there are ways to reconcile that.  So in

17   other words, well, Congress recognized there should be a

18   broader range of punishment -- 10 to life rather than 15 to

19   30 -- because even though the least culpable conduct for the

20   charge in Count 5 is less serious than the least culpable

21   conduct for production of child pornography, the worst is

22   much greater.

23           So I do see that the notion that Congress says

24   there should be a wider range of punishment on Count 5 can

25   make some sense, but I do see the dissidence you're talking

1   about, which is like, well, if Count 5 is so bad as to

2   authorize life, why is its base offense level what it is, and

3   why is the mandatory minimum lower than the offense that has

4   a statutory maximum of 30?

5           MR. BUCKHOLTS:  And in trying to go through the

6   guidelines and research it, it's really hard to put all this

7   together as to what the U.S. Sentencing Commission and

8   Congress -- some of it you can see, which sort of brings me

9   to the variance request.  I'm asking -- Mr. Frei's asking for

10  a variance.

11          I want to make clear from the -- if it was in the

12  position papers, asking for a general variance just on 3553

13  factors considering all of the individual characteristics of

14  Mr. Frei.  But I also wanted to point out to the Court some

15  of these very specific guideline enhancements, the five-level

16  and the four-level for the -- for the number of victim -- the

17  multiple occasions and the enhancement for the grouping.

18          It does appear to me, as Your Honor has pointed

19  out, that some of this looks like it's counting the same

20  conduct multiple times, and I understand that the guidelines

21  sometimes do that and there's sometimes reasons for that.

22          But when you're looking at really a nine-level

23  enhancement, and you go from anything less than life to a

24  life sentence, it is an extremely big jump in the guideline

25  enhancement.

         And so as far as the case cited, the *Bruffy*
case -- and it's always difficult with any case to try to get
on all fours on the facts.  One of the things that I was
looking for in that case and I wasn't able to find is, you
know, I would have been interested to know, is how old was
the Defendant in that case?  Would a judge look at that,
okay, I've got a Defendant that is 50 or 60 -- we'll say even
60 years old, and I have a Defendant that's 20 years old.  Am
I going to sentence the Defendant that's 20 years old to 25
or 30 years to meet some of these goals versus a Defendant
that by -- you know, with that sentence, would effectively be
a life sentence?  And so that's one of the factors.

         And then, of course, some of the similarities and
characteristics with work history and him being the Criminal
History Category I versus other people that are in higher
criminal history categories that this Court has to sentence
every day.

         THE COURT:  Well, and the other thing is, let's
say you had a sentence of -- just throwing a number out, not
telegraphing where I'm going with anything.  But if you had a
sentence -- let's say you imposed, as the Court, a sentence
of 40 years.  Well, maybe a better example would be -- let's
say 35, just the way ages work.  A sentence of 35 years is
much, much closer to a life sentence and, therefore, much
less of a variance than it is for a 20-year-old, correct?

1    You see what I'm saying?

2           So if I were to give a 20-year-old with a

3    guideline sentence of life -- sentence of 35 years, that

4    could be a much bigger variance than for someone who is 47.

5    Why?  Well, it's based on life expectancy.

6           MR. BUCKHOLTS:  Correct.  Yes, Your Honor.

7           So it kind of cuts both ways because on the flip

8    side, you have a Defendant that's reaching an age you could

9    give a 15- or 20-year sentence, it may be a life sentence.

10   So it's sort of -- it does sort of cut both ways on that.

11          I wanted to talk about the specific deterrence

12   issue.  The Government had -- argues that specific deterrence

13   as to Mr. Frei, that a life sentence would meet that goal of

14   specific deterrence.  It's difficult to imagine how a life

15   sentence, it really looks like it sort of conflates specific

16   deterrence with incapacitation.  I mean, I think the better

17   argument, if one is asking for a life sentence, is that it's

18   incapacitation or retribution.  Those are really the only two

19   goals that I can see that the Government could even argue

20   about regarding rehabilitation is not going to be a --

21   enhanced by a life sentence.

22          And I would argue deterrence is not really --

23   especially specific deterrence, because if one were

24   20-something years old and the Court gave a lengthy sentence,

25   arguably a specific deterrent would be, okay, I don't ever

want to be sentenced to that -- I will never commit that crime again because of the lengthy sentence, so you could see.

        But with a life sentence for somebody, that's just simply incapacitation.  It's just, you're not going to be able to commit this crime as to -- we are going to deter you from being, you know -- it's more along the ability to commit such a crime against a minor child.  And so it's more on the incapacitation.

        But with that ties into the factors on incapacitation with the likelihood of re-offending, which, that's why in the briefing, the age is such a huge factor and the other individualized facts and -- of Mr. Frei's life to determine whether -- if the Court was to give a -- grant a variance, whether that would still meet the goal of incapacitation.

        It's his contention that it would, that a 15-year sentence is going to incapacitate him for a number of years, and also the fact that he's going to be on supervision at least five years and is not arguing for anything -- you know, lifetime supervision could be -- would be reasonable.

        THE COURT:  Let me ask you this, and maybe I should ask Mr. Suedekum.  But, you know, one of the reasons we have sex offender notification registries -- I presume they still exist after all these years -- because they are of

1    some value in protecting the public.

2              MR. BUCKHOLTS:  Right.

3              THE COURT:  Would you agree with that?

4              MR. BUCKHOLTS:  Yes, Your Honor.  They're still in

5    existence and yes, they are to protect the public.

6              THE COURT:  Does that decrease the need to protect

7    by incapacitation via incarceration after a certain amount of

8    time?

9              MR. BUCKHOLTS:  The relation to incapacitation of

10   a mandatory reporting requirement, the sex offender registry,

11   those things are in some way going to incapacitate one;

12   definitely going to make it more difficult for somebody to be

13   able to with all of the restrictions and -- of supervision.

14   And along with that, the goal of incapacitation can be met

15   without a life sentence.  It's just that -- it's just

16   that . . .

17             Also, of course, the Court has to be concerned

18   about the disparity in sentences and those situations.  Of

19   course, the Court looks at those, looks at whether or not the

20   likelihood that the person would -- is likely to re-offend

21   upon release is obviously a concern for every judge.  Is this

22   person that I'm sentencing, are we ever going to see this

23   person again, you know, later on down the road?

24             With a 15-year mandatory minimum sentence and a

25   supervision which would be extremely stringent, some of those

1  concerns should be -- should -- wouldn't say minimize.

2  Trying to find the right term.  That should address some of

3  the Court's concerns with being concerned with somebody

4  re-offending.

5          Of course, we've addressed -- and so Mr. Frei is

6  requesting that he be provided with a -- that the Court

7  recommend a Bureau of Prisons sentence that allows him to

8  participate in the residential sex offender treatment

9  program, the most stringent one that -- that there is or the

10  best, I guess I should say, sex offender treatment program.

11  And he would ask that the Court recommend that he be placed

12  in a facility that has that specific program, wherever there

13  may be space available, and that he -- that his sentences run

14  concurrent with each other so that it would be effectively a

15  15-year sentence, and that that type of -- that such a

16  sentence would be sufficient but not greater to meet all of

17  the goals of sentencing and also take into account his

18  individualized characteristics and history.

19          One other thing I would want to address, and this

20  will be the last thing in closing.  Mr. Frei, of course,

21  doesn't receive any reduction.  He did not -- he went to

22  trial; he did not plead guilty.  As the Court is aware,

23  though, he didn't contest the facts at trial.  He did contest

24  the application of the facts to the statutory elements on the

25  production counts, but he hasn't -- he didn't present any

```
1    defense that, it wasn't me, I didn't do that, none of those
2    things.  So the Court could look at that as a -- in light of
3    a variance as well as part of the overall 3553 factors.
4              THE COURT:  All right.  Very well.  All right.
5    Thank you.  I appreciate that, Mr. Buckholts.
6              If Mr. Frei wishes to allocute, he may do so now.
7              THE DEFENDANT:  Yes, Your Honor.
8              First, I'd like to thank Your Honor for your time,
9    and I apologize that we get to meet this way.  And I'm not a
10   very eloquent speaker, so just take this as I come.  It's
11   pretty much impromptu.
12             THE COURT:  No, it's your place to say whatever
13   you want to say however you want to say it.
14             THE DEFENDANT:  As for a question you asked
15   earlier about my military record, I'd like to state that I
16   enlisted at 17, a minor according to these Courts, to serve
17   my country.  I meant no disrespect by my actions today for my
18   previous record.  As for the reason that you cannot find my
19   record, the probation department has the wrong Social
20   Security number.  Can't find me if I don't exist on paper.
21   That -- you know, I have an employer that can verify that.
22   They have a copy of my DD 214 and a copy of my Honorable
23   Discharge certificate.
24             You know, when sentenced, I know I'm guilty.  I'll
25   be punished according to what you believe.  I plan to take
```

```
 1   full effect of any and all programs that I can attend -- that
 2   are feasible, I should say.
 3            I never intended to be here.  This is all a
 4   misunderstanding, a bad judgment, you know.  I was in a
 5   relationship with an individual, a consenting relationship.
 6   On my side, you know, my belief, it was a consenting
 7   relationship.  Bad judgment, yes.  Will not deny that.
 8   Things should have been done different, yes.  Hindsight,
 9   20/20.  I just hope the Court takes that into consideration,
10   you know.
11            As me as a person, I'm one of those ones that if
12   you break down on the side of the road, I'm going to be the
13   guy that pulls up behind you and asks you if you need help.
14   If you've got a flat tire, I'm going to change it.  I'm the
15   one that, you know, I -- charity is -- you gotta pay it
16   forward, you know.  Whatever I do, whatever I've done, I try
17   to help whenever I can and pay it forward because someday
18   it's going to come back to me.  I hope you see that.
19            You know, I've done some things.  I'm made out to
20   be a monster, but I'm not that person.  People can manipulate
21   paperwork, redact, fail to read everything, and come to their
22   own conclusions.  It's done all the time.
23            But I'm not that person.  And if you do not give
24   me life -- I hope that you don't because hope is all a person
25   has -- I guarantee you'll never see me in this court again.
```

1    It's been an exhausting experience for everybody.  It starts
2    with my lawyers.

3              Thank you, Your Honor.

4              THE COURT:  All right.  Thank you, Mr. Frei.

5              All right.  The Court has familiarized itself with
6    the entire record.  As it, of course, indicated and as
7    everyone knows, it sat through the trial; it's listened with
8    interest to what counsel said here today; it listened with
9    interest to what Mr. Frei had said here today as well; and it
10   is prepared to comment on the 3553(a) factors and pronounce
11   sentence.

12             We start with the nature and circumstances of the
13   offense, and the nature and circumstances of the offense are
14   pretty terrible.  They are.  And I was with Mr. Frei on some
15   of his comments.  I felt like others of his comments, though,
16   were unfortunate because I don't think we're dealing with a
17   misunderstanding.  I -- I'm not a psychologist, but if I was,
18   perhaps I would -- well, let me not talk hypothetically.

19             Not being a psychologist, you know, I wonder if
20   Mr. Frei, what he means or what he's rationalized is that
21   it's a misunderstanding that he didn't intend to hurt anyone
22   and that kind of thing.  I wonder if that's what he meant.

23             I do think it's important to understand, though,
24   that as regards the criminality here, there was not a
25   misunderstanding because the age of the victim was known to

Mr. Frei.  I think to Mr. Frei, what he was doing to the victim -- and I'm going to speak in terms of a euphemism -- taking from her something that she couldn't get back, this would be entirely clear.

Now, I understand, from the texts and various other things, that Mr. Frei's circumstances are such that in interacting with the victim in this way, he didn't intend to mean harm in the sense of, I don't know, taking a rock and striking her in the head and leaving her out in the woods.  I understand that.  But the intention to interact with her in a way that, of course, would be harmful to someone that young and that naive is entirely clear.  And in that sense, Mr. Frei, I think, deceives himself if he speaks in terms of it being a misunderstanding.

The part of the record we're dealing with here is a variety of circumstances that would indicate looking for young people to use for sexual purposes.  And not being trained in the psychological arts, I can't say that Mr. Frei didn't rationalize it as if he was doing something nice for them or good for them or so forth.

But what was known to him was that, of course, these were youngsters and persons that he would have known are not in a position to consent.  And from the texts, he would have known that this person, although not our youngest victim, was not someone who could cope with this sort of

advance, could not cope with the sexuality, could not very

well cope with going from no sexual experience whatsoever to

extraordinary sexual experience like that.  And this is

very -- it's very damaging to a young person and it is taking

severe advantage of them and it's extremely serious conduct.

And I think the predatory aspects of this are, I

think, looking for victims online, the clear pattern of

scheming to avoid parents and detection.  Other aspects

were -- for example, you know, if you look at the texts, if

we talk about the graphic nature of the texts, I think you

don't have to be a prude to see that talking this way to an

inexperienced 15-year-old is just terrible.

And, you know, this Court does not sentence

people, you know, based on a version of -- well, it doesn't

sentence people based on their sexual desires, it bases

sentence on conduct.  And what we see is a pattern of taking

advantage of the young person in terms of actual conduct that

would be extremely damaging to a young person.  And this is a

situation where I can imagine someone like Mr. Frei is not

thinking of this as a coercive situation.

And look, I understand the difference between the

situation we had and a situation where if you added in on top

of it, she was, in all respects, literally trying to flee

from him, trying to get away from the very beginning and all

that.  And I understand that distinction.  But under other

laws, this is a form of coercion of a young person whose
consent is no good.  And so what we have is coercive sex of a
young person that was not prepared for it, and it's extremely
serious.

And there are other aspects about it that, again,
you don't have to be a prude but, rather -- you don't have to
be a prude to be just alarmed by some of the features of the
offense such as, for example, the fact that there was sexual
activity taking place in a park in a public place with this
youngster.

So these crimes are very serious.

I had alluded in -- well, let me add something
else about the seriousness of the offense.  Of course, we do
have the whole aspect about filming this.  And, you know, the
effect of that is, every time that this thing is -- video is
replayed or an image is showed or the mere fact that it's
lying around somewhere to be viewed is further victimization,
and that's part of the offense conduct.

I had -- you know, I had asked some questions of
Mr. Suedekum which, I think, are relevant about a life
sentence, and the Court is very concerned about this point.
The Court -- and Mr. Suedekum had indicated he didn't take
the Court to mean this, but the Court's point is not that,
well, you only get a life sentence -- which, again, is the
constitutional maximum for an offense like this -- you only

1    get it if your offense is such that it could not possibly

2    have been worse, or you only get a life sentence if your

3    criminal history could not possibly have been worse.  And I

4    do understand that.

5              I do, though, think that there are ways in which,

6    believe it or not, the offense could be worse than the

7    horrifying way it was that should -- and the Court needs to

8    take account, the victim in looking at the Defense side of

9    this.  Things like, well, the victim could have been younger,

10   the conduct could have been even more coerced than it most

11   certainly was.

12             He didn't physically beat her, but he did assault

13   her.  He sexually assaulted her.  I grant you he didn't do

14   something like beat her.  Maybe in his own mind, he

15   rationalized it as just being a Casanova.  Of course, it's

16   much more serious than that.

17             So far as we know, there was no financial motive,

18   and I suppose the crime could have been worse in that regard.

19             Other things, he could have, for example, got up

20   and perjured himself at trial.  There are various ways in

21   which the offense or the follow-up to the offense could have

22   been worse.  And I think that has to be relevant to the

23   consideration whether the constitutionally maximum sentence

24   is imposed.

25             But none of that is to say that we are dealing

1  with something other than extremely serious conduct, whether

2  we're talking about the contact elements of the offense, the

3  physical contact, or the filming part.  Of course, they're

4  interrelated, but there are a couple of different kinds of

5  harm here.

6          The Court does turn to the history and

7  characteristics of the Defendant.  Now, I think there are

8  several relevant things here.  First, it is certainly a

9  substantial point in the Defendant's favor that he's Criminal

10 History Category I because, you know, he could be the worst

11 offender imaginable with the worst criminal history, and the

12 Government would be asking for the same thing.  And that is a

13 concern for the Court where he could come in with a much

14 worse criminal history record and not be subject to any

15 higher offense than what the Government is asking for, and I

16 think that's relevant.

17         Now, although he's Criminal History Category I,

18 there are a couple of things that concern his criminal

19 history.  One of them appears to be not the most serious

20 offense you see regarding sort of sexual crimes related to

21 young people, but it is related to that.  Now fortunately,

22 there was only one and it was 16 years before the instant

23 offense, but it is there.  And then in prior offenses, we did

24 see the violation that -- violating conduct that I had

25 alluded to.  And that is of some concern, but that was from

1    the 1986 time frame.

2           The Court wants to comment on the history and

3    characteristics of Mr. Frei.  And, you know, I think it's

4    fair to say for Mr. Frei that his upbringing, which has not

5    been disputed, set him up for dysfunctional behavior.  And

6    the Court -- that's not lost on the Court.  You know, if you

7    read about his background, the Court believes, and I don't

8    think it's very controversial, that this sort of background

9    is the kind of thing that naturally lends itself to

10   individuals having unhealthy, inappropriate, and criminal

11   desires of all kinds including, in some cases, sexual ones.

12   But there's also the fact that, you know, no one's here to

13   sentence Mr. Frei for whatever desires; it's the conduct.

14          So, you know, persons with very difficult

15   upbringings, they probably are -- they are entitled, in the

16   Court's view, generally to more leniency than people with

17   less troubled upbringings, and the Court understands that.

18   But on the other hand, there's nothing about a troubled

19   upbringing that makes you carry out the conduct here that

20   harms a victim repeatedly over time.  And so the Court sees

21   both sides of that.

22          You know, the Court tends to understand the

23   difficulties of upbringing and how it sets people up for

24   major failures in life as the sad cycle of the human

25   condition continues.  But people need to refrain from

criminal acts, whatever they're feeling inside, and we hope
they aren't feeling these sorts of desires. But whatever is
going on in here, going out into the world and preying on
people is not okay. But the Defense argument that this sort
of upbringing can be the kind of thing that's cause for
leniency, the Court is willing to accept.

There's some work history and there's discussion
about military history which, again, the Court really can't
make any conclusion about except to say it's not doubting
that there was military service.

There was some work history. There was some work
history reported by Mr. Frei that, according to the PSR, the
employer is insisting -- or, I should say the alleged
employer is insisting it didn't happen. But there is
certainly some work history there, and the Court acknowledges
that.

And the Court is also inclined to agree with
Mr. Buckholts that the lack of these substance abuse issues,
actually that does speak positively to a person's character.
A lot of times in this courtroom, the fact that someone has a
substance abuse issue is treated as a good thing for a
Defendant, meaning grounds for leniency, because it helps
explain criminal conduct.

Well, setting aside that circumstance, here we do
have a history that does not involve substance abuse by all

1  accounts, and that's a point in Mr. Frei's behavior.  Perhaps
2  maybe it reduces the risk of future noncompliance with the
3  law in this case, although one of the things about the risk
4  of recidivism for sex offenders is, their incentives and
5  their acting out on their perceived incentives to reoffend
6  are different than other kinds of offenses, and the Court
7  needs to be concerned about that.  I would call it -- it's a
8  more impulsive crime, although I'm not really sure
9  "impulsive" is really the way to put it because it may sound
10 like it excuses certain actions.
11         The Court wants to talk about some of the policy
12 arguments that were sort of advanced in terms of the
13 congressional goals of sentencing.  One of the things that at
14 least other Circuits have said is that a District Court must
15 acknowledge the congressional statement of intent as
16 manifested by mandatory minimum and high penalties and high
17 maximums, that this kind of criminal activity be punished
18 severely, and the Court certainly does do that.
19         But be that as it may, the Court has a job to
20 announce a sentence sufficient but not greater than
21 necessary, in its view, under all the relevant circumstances,
22 and that's what the Court is going to do.
23         In any event, the Court will impose a sentence
24 that is going to be serious enough to reflect the criminal
25 activity that we saw here that will be sufficient to promote

respect for the law, and it will provide just punishment for the offense. The question is really just how bad the sentence has to be. As high as the Government says or something less? Including, you know, the Court needs to keep in mind, because the Defense has asked for it, the mandatory minimum.

On the issue of deterrence, the Court does believe the sentence has to be substantially deterred both in terms of Mr. Frei in particular, but also the public at large. But I do think it is fair to say that in a hypothetical universe where John Q. Public or Jane Q. Public knows what sentences are being imposed out there, although a life sentence may be more flashy, it doesn't mean that the de facto deterrence value would be greater than a very high term of years, for example.

The Court also believes, and the statutes suggest this, that for this kind of criminal activity, there is great need to protect the public from further crimes of the Defendant. The issue is how long the term of incarceration has to be. And the Court has to keep in mind the possibility that things like sex offender registration and supervised release can have a role post-release in protecting the public.

You know, one answer is, well, we can't be real sure, but I think the Court is allowed to presume they have

1  some value because that's why we have them.

2         These things are expensive.  Supervised release

3  and sex offender notification, registry notification

4  regimens, are very expensive and yet they remain in place,

5  and the Court can read some value in reducing the risk of

6  recidivism to that.

7         The Court would also note that this may be a case

8  where -- and I think it -- I'm wondering if there's any way

9  where it could not possibly be anything other than the case.

10  In other words, this has to be a case where compared to

11  younger offenders, the variance from the term of years that

12  the Court could announce would be less of a variance than we

13  would see for younger offenders if the Court was to pronounce

14  a sentence of a term of years.

15         The Court has all these things in mind and wants

16  to comment in some detail about the next issue, the one of

17  sentencing disparities.  And one of the things that the Court

18  notes in studying in some detail -- and it's sliced and diced

19  numbers all over the place -- but it wants to note the

20  following about what we see for broad categories of offenses.

21  And the Court is well aware that each offense is different.

22  And it may be that a great number of these offenses are not

23  as serious as Mr. Frei's conduct, but it could be that some

24  are worse, and that's one of the reasons I outlined ways in

25  which the offense kind of could have been worse.

1    So within the broad categories of child

2  pornography, and in the Court's view, really, the -- if we

3  look at what the Sentencing Commission, for purposes of these

4  statistics, would consider child pornography, really, we'd be

5  talking about Count 9 only.  The other counts of conviction,

6  it's categorizing as sexual abuse cases which is a different

7  category.

8    For child pornography, in fiscal year 2018, the

9  mean sentence for child pornography in this country was 104

10  months.  That's the average sentence, of course.  The median

11  is 87 months.  For Criminal History Category I, it's 88

12  months and 77 months being the median.  So for Criminal

13  History Category I like the Defendant, an average of 88, a

14  median of 77.

15    If we look at sexual abuse cases, for all criminal

16  history categories, the mean months is 191; the median is

17  180.  For Criminal History Category I, the mean is 181, and

18  the median is 156.

19    Now, the Court does have these in mind as sort of

20  general guidelines to think about.  You know, Mr. Suedekum

21  correctly points out, for example, in the case upon which the

22  Defendant relied, that the -- that's the *Bruffy* case -- that

23  there were definitely worse factors than exist in this case.

24    The Court also notes a couple of other statistics.

25  For child pornography cases, the variance rate is 68 percent.

1  Now, some of those may be upward variances.  The Court thinks

2  it would not speak out of school, though, to say that it is

3  likely that most are downward variances because child

4  pornography has high guidelines.  But in some cases, I'm sure

5  Courts feel they aren't high enough.

6         In terms of the sexual abuse cases, the variance

7  percentage is 40 percent, so it's not uncommon to have these

8  variances.

9         The Court would also note, when it thinks about

10  the sentence of life that the guidelines suggest, it also

11  looks at a case like *United States vs. Richards* out of this

12  Court, a Sixth Circuit case, affirming a sentence of a term

13  of years where the guideline range was life, the guideline

14  sentence was life.  And that is at *United States vs.*

15  *Richards*, 659 F.3d 527.

16         Now, the term of the years there that was imposed,

17  the Court will say ended up being much lower than what the

18  Court is going to impose here.  And that's by way of saying

19  the Court has no doubt that even though a sentence of life is

20  the guideline sentence, that a sentence to a significant term

21  of years is an appropriate variance, and the Court will not

22  impose a sentence of life but a term of years that I'm going

23  to discuss.

24         One of the things is -- and I understand that the

25  Government's argument in favor of life, it's the guideline

sentence. The Government believes passionately in the case and for punishment and for the other congressional purposes of sentencing, but, of course, the Court's role is different and it's looking at both sides of the equation, does not believe that a sentence of life needs to be imposed in this case. The question is what term of years does need to be imposed.

And I will say that it's not surprising that the Defense asked for the mandatory minimum. That would be the kind of thing you might suggest as Defense counsel, of course. The Court believes that that is not high enough, for a variety of reasons.

That would start to look at, even based on -- you know, even based on Mr. Frei's current age, you could be then looking at a really major variance, de facto, between a life sentence and the sentence that he would serve, so the Defense doesn't have that just right either. There are a few different ways of looking at what sentence would be appropriate.

The guidelines, I want to talk about the guidelines being Level 43. If the five-level enhancement was taken off from the Level 47, we'd be looking at 360 to life. And, of course, I'm talking about an alternative hypothetical guideline calculation and not to diminish from the fact that our guideline sentence is life.

1    But I think that that is not an inappropriate way
2  to think about perhaps a more realistic alternative guideline
3  range, if you will, not taking away the fact of what the
4  guideline range actually is.

5    And I do think that really, the same -- the same
6  reasons why you have the multi-count enhancement which is,
7  you do have multiple crimes, as Mr. Suedekum says, violate
8  various statutes; but it's about the reason -- the way this
9  was charged and tried and convicted, it's about the fact --
10  not just that, you know, one act ended up violating multiple
11  statutes -- it's about repeated conduct, repeated conduct
12  that was, to be sure, predatory, extremely wrongful, hurtful,
13  and the kind of thing that's difficult to think about.

14    But I do think that the substance of the fact that
15  we had repeated conduct in this case towards the victim that
16  was criminal and harmful is essentially adequately accounted
17  for by the four-level, multi-count adjustment.

18    Now, if we think about a guideline sentence of 360
19  to life, I think that's closer to where we need to land.  But
20  I am concerned about being quite as high as 360 months.  One
21  of them is this, and the parties have not cited sort of how
22  often we have life sentences.  But as I say, there are a lot
23  of variances in these cases, and the average sentence, even
24  for the more egregious category of sexual assault cases, is
25  much lower than 360.  And so the Court is inclined to believe

1    that 360 is a little bit high.

2         There is a lot of discretion in sentencing.  And
3    the Court has looked at this many different ways, and there
4    are a lot of different things that, in the Court's view, are
5    pointing towards a sentence towards the low 300-month range.
6    And a lot of different things when the Court tries to think
7    substantively.  One is that the Court does not believe a
8    sentence of more than that is necessary to promote respect
9    for the law, provide just punishment -- that's a severe
10   punishment -- to reflect the seriousness of the offense, or
11   to afford adequate deterrence.

12        But there were numerous aggravating circumstances
13   in this case that make the sentence come in at a level much
14   above what the Defense is asking for.  The kinds of things
15   that repeatedly point the Court in the low 300 range are
16   things like if you were to -- when you conceptualize the
17   wrongdoing here, you have a serious component that's more in
18   the nature of the problem being sexual abuse and other
19   aspects of it that are more in the nature of child
20   pornography, and they're each offensive in their own way.
21   And if you were to think about an average or a mean sentence
22   of the two of them put together, you're right around 200
23   months for an average sentence -- excuse me -- 300 months.

24        Also, suppose you were to take a mandatory minimum
25   for child pornography, and the statutory maximum for all

1    offenders, not just ones with the low criminal history of the

2    Defendant, you'd be looking at 27 years which would be in the

3    lower end of 300 months.  300 months is, in terms of a

4    percentage, not a whole lot less than what the Court thinks

5    is a more realistic effective guidelines range.

6            The Court is inclined to think about the -- the

7    notion that in this case -- and again, I understand there's a

8    lot of discretion and it's not like this is a mathematical

9    calculation that you can put together, and it's not like

10   Tennessee state law really has anything to say ultimately

11   about federal sentencing.  But the notion that you would

12   have -- if you think about a very severe sentence for this

13   kind of contact offense, which is a predicate offense for the

14   Government, plus a serious and mandatory minimum sentence for

15   child pornography, you would be looking at, hypothetically

16   324 months.

17           And I do think that considering all the factors

18   together, it's not surprising that that view of the situation

19   is indicated by several different measures of the way of

20   thinking about this case substantively.

21           I also think a little bit of credit for the fact

22   that there was some prior incarceration related to the

23   offense of conviction would be appropriate.

24           So in conclusion, over the Government's objection,

25   the Court will grant the motion for a downward variance and

1  will impose a sentence of a term of years.  It is not a --

2  despite the way I've talked about slicing and dicing the

3  numbers, the Court does not present this as some mathematical

4  magical calculation; rather, it's where the Court sees

5  several different indications converging for the sentence on

6  a very significant crime.

7         And one final thing I will say is, we have a

8  couple of different things here on the issue of acceptance of

9  responsibility.  Mr. Buckholts is correct that their defense

10 was the kind of defense where the one time I've seen someone

11 go to trial in a case I was involved in and get convicted and

12 yet get acceptance of responsibility, it was the kind of

13 offense that we had here, and I understand that.

14        Where the argument really isn't so much about, you

15 know, kind of what happened or Defense counsel wasn't getting

16 their necessary argument that nothing was wrong.  I sort of

17 understand that.

18        And yet on the other hand, on balance, we really

19 don't have acceptance of responsibility, particularly in

20 light of a couple of things.  The PSR would indicate some

21 incorrect denials from the Defendant about what he was doing

22 and his storing of images.

23        I think Mr. Frei's comments -- which, on balance,

24 I will say did not hurt him.  I don't want to think it hurt

25 him to get up and talk, but I still perceive there's not

really an awareness of what all went wrong here and why this

conduct is so bad and so serious.

But I do want to credit the Defense team on this

point, and it helped keep the sentence lower than it might

have been, for the way they litigated the case, which --

which does lend, in part, this notion of some kind of maybe

variant of acceptance of responsibility.  It also helps for

someone that does not get acceptance of responsibility, they

don't get up on the witness stand and perjure themselves.

That's the kind of thing that helps too.

So I have these factors in mind also when

considering sentence.

All right.  So that having said, I've talked at

some length, and I've done so because this set of crimes are

very serious.  The guideline range -- which is, in fact, not

a range at all but just simply a sentence of life -- is very

serious.  The mandatory minimum is very serious.  The

difference between the parties is very large.  There's a lot

to talk about.  Although I would note that if Mr. Frei was

younger, the kind of variance that I'm going to order here in

a minute would be a substantially greater variance, most

likely, would be the effect of it.  At age 47, it's not as

great of a variance.

And whether it will turn out to be a variance at

all, we all hope so.  I think no one in here is hoping that

1  Mr. Frei won't serve his sentence, go on to supervised

2  release, and become a law-abiding citizen in a way where our

3  citizens are protected.  But, of course, life is uncertain,

4  so we will see -- we will see.  But what the Court can say,

5  and it's important, is that the variance is not as great as

6  it would be for a younger person by any means.

7           All right.  All that having been said, the Court

8  is prepared to pronounce sentence.

9           And Mr. Frei, it is the judgment of the Court that

10  you shall be committed to the custody of the Bureau of

11  Prisons for a total term of 318 months.  And the sentence

12  will be ordered as follows.  The sentence on each of

13  Counts 1, 2, 3, 4, 5, 6, 7, and 9, will be 318 months all

14  counts -- excuse me.  I said that wrong.  My apologies.

15           The sentence on Counts 1, 2, 3, 4, 5, 6, and 7

16  will be 318 months.  The sentence on Count 9 will be 240

17  months.  All counts will run concurrently.

18           In terms of supervised release, the Court will

19  impose a lifetime term of supervised release on Counts 1

20  through 7 and 9.  Not surprising as it's a lifetime term on

21  each count.  Those will run concurrently.

22           The fine in this case -- and I'm going to return

23  to supervised release in a moment.  The fine in this case

24  will be waived due to the Defendant's financial inability to

25  pay a fine.

1    Restitution will be ordered to the victim in the

2  amount of $2,080, and I will say that the Court, in making a

3  restitution order, is mindful, in what it puts out there, the

4  fact that it's a minor victim.  And so in terms of how the

5  restitution order is written, memorialized, the Court has

6  that in mind.

7    A special assessment of $800 is mandatory and will

8  be imposed.

9    The JVTA assessment will not be imposed due to the

10 Defendant's indigency.

11    The Court also notes that in this case, there is a

12 preliminary order of forfeiture which will be -- well, I take

13 it back.  It's not a preliminary order of forfeiture.  What

14 it is, is a stipulation of forfeiture between the parties,

15 and the Court intends and has always treated that as a

16 preliminary order of forfeiture which becomes, under Rule

17 32.2, final as to the Defendant upon his conviction, and that

18 will be ordered as well.

19    I'm going to return to supervised release.

20 Mr. Frei, after release from prison, you will be placed, as I

21 say, on a term of supervised release for life.  And the

22 conditions of supervised release are ones that the parties

23 have not objected to on either side, and the Court finds them

24 appropriate under Title 18, United States Code, Section 3583

25 which directs the Court to Section 3553(a) factors

1    specifically applicable to supervised release.

2              What I'm going to do is this:  Unless the

3    Defendant waives the reading of these, I'm going to read them

4    all aloud here in court.

5              And I wanted to ask you, Mr. Buckholts:  Does the

6    Defendant waive reading, or can I refer by reference to the

7    conditions set forth in the presentence report?  It's

8    whatever you want.  I don't want to . . .

9              (Respite.)

10             MR. BUCKHOLTS:  He would like to waive it, Your

11   Honor.

12             THE COURT:  Okay.  Very well.  Then what the Court

13   will say is, again, absent objection, there are a total of 14

14   different special conditions of supervised release.

15             And Mr. Frei, have you been able to review those

16   special conditions of supervised release and go over them

17   with counsel?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  All right.  Any questions about any of

20   them?

21             THE DEFENDANT:  Not right now, Your Honor.

22             THE COURT:  Okay.  Those conditions, at the time

23   of your release, will be reviewed with you by the probation

24   officer, and they will all be included in your written

25   judgment together with the standard and mandatory conditions

1    of supervised release which I'm going to talk about in a

2    minute, so they will all be there for you.  They will be gone

3    over by the probation officer, and you can have that

4    discussion at that time if you have questions at that time.

5              The other thing I did want to touch on was that

6    there are 13 standard conditions of supervised release, and

7    for folks in this district placed on supervised release,

8    these are almost always imposed.

9              There are also certain mandatory conditions of

10   supervised release, and I am going to read the mandatory

11   conditions of supervised release.  I think that that's

12   probably helpful because it wasn't laid out in the PSR the

13   way the special conditions were.  I'm going to read them to

14   you.

15             Then I'm going to ask Mr. Buckholts:  The 13

16   standard conditions of supervised release, would you wish for

17   those to be read?

18             MR. BUCKHOLTS:  No, Your Honor.

19             THE COURT:  Okay.  Thank you.

20             I do think we need to read the mandatory

21   conditions aloud since they were not in the PSR.  And they

22   can vary a little bit case by case, so I'm going to read them

23   for you.  And when I refer to the Defendant, obviously,

24   Mr. Frei, I'm referring to you.

25             Here's how we'll read:  The Defendant must report

1  to the Probation Office in the district to which the

2  Defendant is released within 72 hours of release from the

3  custody of the Bureau of Prisons.  The Defendant shall not

4  commit another federal, state, or local crime.  The Defendant

5  shall not unlawfully possess a controlled substance.  The

6  Defendant shall refrain from any unlawful use of a controlled

7  substance.  The Defendant shall submit to --

8          Well, let me ask this:  Any objection from the

9  Government for waiving the condition of drug testing, given

10  the Defendant's record?

11         MR. SUEDEKUM:  No objection, Your Honor.

12         THE COURT:  Okay.  Very well.  Then that condition

13  will be waived.  So given your history, you would not be

14  required to do drug testing, but you do need to refrain from

15  unlawfully possessing a controlled substance or using a

16  controlled substance.

17         You shall not possess a firearm, ammunition,

18  destructive device, or any other dangerous weapon, and you

19  shall cooperate in the collection of DNA as directed by the

20  probation officer.

21         And you shall register with the state sex offender

22  registration agency in the state where the Defendant resides

23  or is a student as directed by the probation officer.

24         Finally, I wanted to note again that this will be

25  laid out in your written criminal judgment.

1          Before asking the parties if they have any

2    objections beyond those that have previously been expressed,

3    the Court wants to say it notes that it imposed a sentence

4    substantially higher than the Defense was asking for and

5    something that was not the life sentence the Government was

6    asking for.  Based on all the 3553(a) factors, however, it

7    believes that this was the appropriate sentence, considering

8    a variety of often conflicting factors about which way the

9    sentence should go.

10          The Court came out at 318 thinking that a sentence

11   in the range of roughly 27 years with a little bit of credit

12   for sentence served on the prior conviction that implicated

13   relevant conduct was the appropriate sentence in this case.

14          So having said that, are there any objections to

15   the sentence just pronounced beyond those that have

16   previously been expressed?  Mr. Suedekum?

17          MR. SUEDEKUM:  Your Honor, I think the Court

18   already noted that the United States does object to the

19   variance.

20          THE COURT:  Very well.  That is noted.

21          Mr. Buckholts?

22          MR. BUCKHOLTS:  None that have not already been

23   raised, Your Honor.

24          THE COURT:  All right.  Thank you very much.

25          The final thing I need to do is advise you of your

1   rights to appeal, Mr. Frei.  And, of course, you were

2   convicted at trial and have been sentenced here today.  You

3   have a right to challenge your conviction that was sustained

4   at trial, and you have the right also to appeal your

5   sentence.

6           I'm getting that look from our probation officer

7   like there's something that we need to cover.

8           PROBATION OFFICER:  Regarding the special

9   conditions, the Probation Office didn't initially include the

10  special condition for restitution because there was no issue

11  of restitution, so I don't know if you want to include that

12  as a special condition.  It's not one of those 1 through 14

13  conditions noted.

14          THE COURT:  Yeah, and so the standard -- on that,

15  the standard language would be that the Defendant -- well,

16  the Defendant shall -- I'm trying to think what you have

17  versus "not" at the end there.  There is the condition

18  already about financial disclosure, but it would be that --

19  is it the standard language that the Defendant shall make

20  restitution?

21          PROBATION OFFICER:  I believe it's like 10 percent

22  of his gross income or it will start as part of the Bureau of

23  Prisons program.

24          THE COURT:  Yes.  Yes, where the language is, you

25  know, hey, while you're on supervised release, you are

1  required to make progress towards the payment of any

2  restitution or special assessment.  But you are expected to

3  make payment from any earnings in prison employment programs.

4          Do you know the condition I'm talking about,

5  Mr. Buckholts?

6          MR. BUCKHOLTS:  I'm somewhat aware that -- my

7  understanding is -- I couldn't cite you the provision, but

8  where somebody is working and they get -- there's a -- some

9  percentage that gets taken of their income to go towards any

10  special assessment or fines or restitution.

11          THE COURT:  Exactly.

12          MR. BUCKHOLTS:  Am I correct on that -- on that,

13  at least the substance of what the rule is?  I can't even

14  cite you the exact rule there.

15          THE COURT:  All right.  Very well.  And I wish I

16  happened to have a copy of the words that are typically used

17  in the condition.

18          PROBATION OFFICER:  I do happen to have it here.

19          THE COURT:  Okay.  Yeah, if that could be handed

20  up, that would be great.

21          All right.  The question being should this be

22  included with the 14 we already have.  So Mr. Frei, here is

23  the proposed additional condition of supervised release.

24          "You shall pay restitution in an amount totaling

25  $2,080 to," and it would make a reference to the minor victim

1    in this case.  The victim's address will be provided to the

2    Clerk of the Court under separate cover.  Payment shall be

3    submitted to the Clerk, United States District Court, 801

4    Broadway, Nashville, Tennessee, 37203.  While incarcerated,

5    payment shall begin under the Bureau of Prisons Inmate

6    Financial Responsibility Program.  Should there be any unpaid

7    balance when supervision commences, you shall pay the

8    remaining restitution at a minimum monthly rate of 10 percent

9    of your gross monthly income.  No interest shall accrue as

10   long as you remain in compliance with the payment schedule

11   ordered.  Pursuant to Title 18, United States Code,

12   Section 3664(k), you shall notify the Court and the United

13   States attorney of any material change in economic

14   circumstances that might affect ability to pay.

15           So that's the proposal.  So Mr. Buckholts, if you

16   want to discuss it with Mr. Frei, you can talk about it.

17           (Respite.)

18           MR. BUCKHOLTS:  That's fine, Your Honor.

19           THE COURT:  Okay.  Absent objection, that will be

20   ordered as special condition 15.

21           So since I have technically altered my

22   pronouncement of the sentence, are there any objections now

23   beyond those that have been previously expressed to the

24   sentence in full as it has been ordered?  Mr. Suedekum?

25           MR. SUEDEKUM:  None other than those already

1    stated, Your Honor.

2              THE COURT:  All right.  Thank you.

3              MR. BUCKHOLTS:  Judge, there's one other thing.

4    We'd asked for a recommendation that he be placed at the

5    Bureau of Prisons in -- for sex offender treatment.

6              THE COURT:  I should make sure I have all your

7    recommendations, and I will say this:  What I was thinking

8    was that, you know, there is some language in your brief that

9    the Court might use in making that recommendation.  But I do

10   understand the gist of it is that there may be two different

11   levels of sex offender treatment programs in prison.  You

12   would like placement, regardless of location, to a location

13   that can get him ideally the top-level program, and failing

14   that, a location that has the ability to provide him the

15   second level program; is that right?

16             MR. BUCKHOLTS:  That's correct, Your Honor.

17             THE COURT:  Okay.  All right.  That will be

18   included.  And just to make sure, any other recommendations?

19             MR. BUCKHOLTS:  I think that was it, Your Honor.

20             THE COURT:  Okay.  Thank you.

21             So what I'm going to do then is advise you of your

22   rights to appeal, Mr. Frei, and then make a couple of final

23   remarks about a case that for different reasons, for

24   different folks, was difficult for all.

25             You have the right to appeal your conviction and

1  your sentence, but any appeal needs to be initiated by a

2  Notice of Appeal which must be filed within 14 days of the

3  time the written judgment is issued in this case, which we

4  expect to be in the next few days.

5         If you do not file a Notice of Appeal within 14

6  days of that time, you could and likely would waive your

7  right to appeal.  So if you're interested in appealing your

8  conviction and/or your sentence, speak with Mr. Noel and

9  Mr. Buckholts about it, and if you direct them in clear terms

10 to file a Notice of Appeal, they would be obligated to do so.

11        Also, because you are indigent, the Clerk of this

12 Court could file a Notice of Appeal for you on your behalf,

13 but after all, that's what your current counsel are here for.

14        You would have the right to apply for permission

15 to appeal without paying court costs due to your indigent

16 status, if you believe you still have indigent status.  And

17 for any period of time in which you have indigent status, you

18 would have the right to Court-appointed counsel paid for at

19 public expense, and you can apply for that if you appeal.

20        Any questions about your right to appeal?

21        THE DEFENDANT:  No, Your Honor.

22        THE COURT:  All right.  Thank you.

23        I wanted to make a couple of remarks about counsel

24 for the Defense.  These are difficult cases given their

25 nature.  For reasons we've all been talking about, these are

1   very serious cases that -- that provoke very negative

2   reaction in people for understandable reasons.  The system

3   relies on Defense counsel being willing to take these cases

4   and defend those who have been accused of these things,

5   because until we have a conviction, we don't know if there's

6   any validity to these allegations or not, serious though they

7   may be.  And so the Court relies on Defense counsel willing

8   to take these cases and litigate them, and the Court does

9   wish to commend Defense counsel for being dealt a difficult

10  hand here in terms of the facts and the law and the statutory

11  maximums and the mandatory minimums and doing their very

12  best, being experienced counsel, and putting the best foot

13  forward for the Defense.

14          The Court is not going to say more than that

15  because it's not appropriate to comment on, you know, the

16  quality of the defense, and that's not what I mean to do

17  because that's not really my role.  But what I can say is

18  that the Court appreciates experienced counsel coming in here

19  and litigating the case the way it has been litigated here,

20  and certainly litigating it in good faith.

21          And if the Court may say so, the Court perceives

22  Defense counsel's interests in trying to keep the attention

23  on those areas that were in dispute where they can make

24  potential progress for their client rather than wasting the

25  Court or the Government's time.  At least that's my

1   perception and I hope that's the Government's perception as

2   well.

3           But in -- the final point is, the Court is

4   appreciative of counsel who are not making millions off of

5   cases like this representing indigent Defendants, doing this.

6           All right.  This has been a very serious case.

7   We've talked at length here this afternoon because the

8   consequences of this case, these charges, these convictions,

9   these statutory range of penalties is so severe.

10          Is there anything further we need to discuss at

11  this time?

12          MR. SUEDEKUM:  No, Your Honor.

13          MR. BUCKHOLTS:  No, Your Honor.

14          THE COURT:  All right.  Thank you, Counsel.  We

15  stand in recess.

16          (WHEREUPON, the foregoing proceedings were

17  concluded at 5:21 p.m.)

18

19

20

21

22

23

24

25

1   REPORTER'S CERTIFICATE

2

3           I, Deborah K. Watson, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Tennessee, with offices at Nashville, do hereby certify:

6           That I reported on the Stenograph machine the

7   proceedings held in open court on January 13, 2020, in the

8   matter of *UNITED STATES OF AMERICA vs. JAMES FREI*, Case No.

9   3:17-cr-00032-1; that said proceedings in connection with the

10  hearing were reduced to typewritten form by me; and that the

11  foregoing transcript (pages 1 through 97) is a true and

12  accurate record of said proceedings.

13          This the 27th day of March, 2020.

14

15                              /s/ Deborah K. Watson
                                DEBORAH K. WATSON, RPR, CRR, LCR
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25