```
 1                 IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF TENNESSEE
 2                        NASHVILLE DIVISION

 3
    UNITED STATES OF AMERICA          )
 4                                     )
                                       )
 5       v.                            )  3:17-CR-00032-1
                                       )  JUDGE RICHARDSON
 6                                     )
    JAMES FREI                         )
 7                                     )
                                       )
 8  ------------------------------------------------------------

 9

10

11

12

        BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE
13

14                    TRANSCRIPT OF PROCEEDINGS
                          CLOSING ARGUMENTS
15

16                      February 14, 2019

17

                        TRIAL VOLUME 3-A
18

19

20

21

22  ------------------------------------------------------------

23  DEBORAH K. WATSON, RPR, CRR, LCR
    Official Court Reporter
24  801 Broadway, Room A837
    Nashville, TN 37203
25  debbie_watson@tnmd.uscourts.gov
```

```
1   APPEARANCES:

2


3   For the Government:

4              MS. KATHRYN RISINGER
            MR. J. CHRISTOPHER SUEDEKUM
5           Assistant U.S. Attorney
            U.S. Attorney's Office
6           Middle District of Tennessee
            110 Ninth Avenue South
7             Suite A961
            Nashville, TN 37203-3870
8           (615) 736-5151
            katy.risinger@usdoj.gov
9           chris.suedekum@usdoj.gov

10


11  For the Defendant:

12             MR. MICHAEL DAVID NOEL
            40 Burton Hills Boulevard
13            Suite 200
            Nashville, TN 37215
14          (615) 373-5597
            mdnoel02@bellsouth.net
15
            MR. CHARLES D. BUCKHOLTS
16          40 Burton Hills Boulevard
              Suite 200
17          Nashville, TN 37215
            (615) 386-7118
18          chuck@buckholtslaw.com

19

20

21

22

23

24

25
```

1                        I   N   D   E   X

2                                                    Page

3    CLOSING ARGUMENTS

4    By Ms. Risinger                                   4
     By Mr. Buckholts                                 17
5    By Ms. Risinger                                  27

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              *    *    *
 2              The above-styled cause continued to be heard at
 3    10:05 a.m. on February 14, 2019, before the Honorable Eli J.
 4    Richardson, District Judge, when the following proceedings
 5    were had, to-wit:

 6

 7              (Beginning of requested excerpt of closing
 8    arguments in the above-named case given on February 14,
 9    2019.)

10

11              MS. RISINGER:  Thank you, Your Honor, counsel.
12              May I have the screen, please?
13              "I am going to teach you everything I know about
14    sex; and by the end of the summer, you are going to know more
15    than your mom and your dad."
16              Those are the words that the Defendant, James
17    Frei, said to 15-year-old Taylor, and he said it within days
18    of messaging her on Facebook and before ever having met her.
19              Now, his intent, from the very first message, was
20    crystal clear.  This was about sex, pure and simple.  It was
21    about sex with 15-year-old Taylor.  But he wasn't just going
22    to have it; he was going to film it.  He was going to
23    photograph it.  He was going to memorialize it with his
24    cell phone.  This is not a case of two teenagers in love.
25    This is not a case of an adult consensual relationship.
```

1    There were no trips to the movies, to the Disney movies that

2    15-year-old Taylor loved.  There were no fancy dinners at a

3    restaurant in downtown Nashville.  There was no courting

4    phase.  This relationship was pure manipulation by the

5    Defendant, and it was that manipulative relationship through

6    which he committed the eight crimes he is charged with.

7            Let's talk about those eight crimes and what they

8    are.  Counts 1 through 4 charged the Defendant with

9    production of child pornography on four different dates:  May

10   11th, May 17th, June 3rd, and June 5th.  And what that means

11   is the Defendant used or enticed a minor to engage in sexual

12   activity for the purpose of producing an image and that the

13   visual depiction or the image was produced using materials

14   that had been shipped, mailed, or traveled, transported,

15   imported for interstate commerce.

16           So what does that mean in the context of this

17   case, why we're here today?  What it means is that the

18   Government had to prove -- and we did prove -- that the

19   Defendant, James Frei, used or enticed 15- or 16-year-old

20   Taylor to engage in sex and he produced images of it -- he

21   produced those photos and those videos -- and that the photos

22   and videos were produced using the Defendant's cell phone.

23   Because as you heard in the stipulation, that cell phone was

24   manufactured in China.  So that cell phone was manufactured

25   with materials that had been shipped or transported in

1  interstate commerce.  So the images and videos on that

2  cell phone meet that requirement.

3          But that stipulation isn't the only evidence of

4  that.  You also have the Defendant's transportation of that

5  cell phone back and forth multiple times between here and

6  North Carolina.  That's also transporting in interstate

7  commerce.

8          Count 5.  This is sometimes referred to as online

9  enticement of a minor or persuading a minor to engage in

10  unlawful sexual activity.

11          Let me say one thing before I go a little further.

12  The elements of each of these offenses, sometimes they'll say

13  "illicit sexual activity" or "sexually explicit activity" or

14  "unlawful sexual activity," and each of the charges you would

15  get from the Judge will further define each of those terms.

16          But let me be very clear:  The sex in this case

17  with a 15-year-old from May 8th up until May 30th and then

18  from May 30th through June 5th with a 16-year-old, it

19  satisfies every definition of whether it's unlawful, sexually

20  explicit, however the charge says it.

21          So what did the Government have to prove to show

22  that he is guilty of Count 5?  We have to prove that he

23  enticed, induced, or persuaded an individual under the 18 --

24  age of 18 to engage in unlawful sexual activity, that he did

25  so using a means or facility of interstate commerce, and that

1    the Defendant knew the individual was under 18.

2          So again, in the context of this case, to simplify

3    it, what's that mean?  It means the Defendant, James Frei,

4    persuaded, induced, or enticed 15-, 16-year-old Taylor to

5    engage in sex, that he used his cell phone or the Internet to

6    entice and induce her.  That will be in the instructions: a

7    cell phone and the Internet or facilities of interstate

8    commerce.  And through the Internet in this case, that's

9    Facebook.  And third, that he knew -- which he did -- that

10   Taylor was underage, that she was 15 or 16.

11         Counts 6 and 7, traveling with the intent to

12   engage in sexual activity.  What that means is that when the

13   Defendant traveled from North Carolina -- well, let me stop.

14   What that means is that the Defendant had to travel in

15   interstate commerce on or about the dates alleged in those

16   counts, and that he did so with the intent to engage in

17   sexual conduct.

18         So in the context of this case, that means James

19   Frei traveled from another state -- North Carolina or

20   anywhere else outside of Tennessee -- to Tennessee on or

21   around the dates alleged, and that when he did so, when he

22   traveled, he intended to have sex with 15- or 16-year-old

23   Taylor.

24         And the last count -- there's no Count 8., so just

25   to not confuse you when you get back there, there's no

1  Count 8.

2          The last count, Count 9, is transporting child

3  pornography, and that is that the Defendant knowingly

4  transported in interstate commerce items or items of child

5  pornography, and that when he transported those items, he

6  believed that they were child pornography.

7          In the context of this case, James Frei knowingly

8  transported the images and videos he took of 15-, 16-year-old

9  Taylor across state lines and that when he transported those

10  photos, he believed them to be child pornography.  He knew

11  them to be child pornography.

12          From the moment James Frei met Taylor on Facebook,

13  he began grooming her.  You heard her testify at the time,

14  she was an inexperienced and impressionable young girl, and

15  at that particular time in May 2016, she was especially

16  vulnerable.  And she was vulnerable because the people she

17  thought were her friends, her high school friends, were

18  bullying her.  And they were doing it because she has, of all

19  things, diabetes, and would have to miss school.

20          So her friends were making fun of her, and she

21  became withdrawn, she became depressed.  And so what did she

22  do?  Well, she tried to rectify the situation.  She picked

23  herself up, and she thought, "I'll join a Facebook group for

24  teens.  And maybe through that group, I'll find some friends.

25  I'll find some friends that won't bully me because of my

1    medical condition."

2              And it was through that group, that Facebook teen

3    group, that the Defendant, 47-year-old James Frei, found

4    Taylor and began preying on her.  And from that moment on,

5    from the very first message on May 3rd, 2016, he began

6    setting the stage.  He complimented her, called her sexy.

7    That was the very first message.  Told her she looked cute,

8    that he loved her smile.

9              When he was saying those things, there's no doubt

10   that he knew her age, because in the first message she sent

11   him, she told him she was 15, almost 16.  Well, let's just

12   say he forgot that message.  Well, that wasn't the only time

13   they talked about it.  In fact, when she sent him a photo of

14   her in a blue dress and said it was from Easter of the year,

15   he had the audacity to say, "You don't look 15 in that photo.

16   You actually look 13 or 14.  But hey, I mean that in a good

17   way.  That's a good thing.  Because I don't care if you were

18   13 or 14."

19             That's what the Defendant said to Taylor.

20             Now, he asked her for pictures, and he did that

21   pretty quickly.  And at first he eased into it, right?  He

22   asked her for some pictures of her dressed.  But then he

23   escalated it.  He started asking, "Wish you could send a bra

24   and panty pic."

25             Well, what he really wanted, what he really loved,

1  were nudes.  Would she send a nude pic?  "Could we do some

2  cam to cam at night?"  And when she said she didn't have

3  those pics and she didn't have the camera, he said, "Well,

4  that's okay.  Can I take pics tomorrow?"

5          He suggested visiting her.  That was his

6  suggestion, to travel to Nashville from North Carolina.  But

7  he knew he had to plan how to do this.  He couldn't just show

8  up at her apartment one day when her dad was home and her

9  12-year-old brother was playing Xbox or whatever 12-year-olds

10  do.  So he had to plan.  And he started doing that with her.

11  "What time will your dad be home?  Is your dad gone?"

12          And then that went to, "Do you have a building?

13  Do you have a big backyard?  Do you have a building in your

14  backyard?"

15          I mean, I guess the Defendant was planning to take

16  15-year-old Taylor, a virgin, and bang her in the toolshed

17  next to a lawn mower if he could.  But she lived in an

18  apartment, so that wasn't going to work.

19          So what about a park?  Maybe a park.  And he

20  thought, "Well, there might be a few too many people, but

21  maybe a park would work."

22          And finally the Defendant had an idea.  What about

23  a friend?  What about a friend?  "Do you have a friend who

24  would cover for you, a friend who you can say you were going

25  to spend the night with when in reality, you come and stay

1  with me at a hotel?"

2         Planning how to sneak around and how not to get

3  caught, that is manipulation at its best.  That is conniving.

4  That is evidence of the Defendant's intent to travel and

5  engage in sex with 15-year-old Taylor when he got here.

6         He asked her personal questions.  He asked her

7  about her period.  He asked her if she masturbated, asked her

8  if she wanted him to masturbate.  And then -- and then he

9  sent incredibly graphic messages to a 15-year-old girl about

10 everything he wanted to do to her.

11        Now he started -- he started soft.  He said, you

12 know, "I believe a woman's first time should be made love

13 to."  I guess in that toolshed or the park.

14        Then it escalated.  It escalated quickly.  And you

15 can see it on the screen.  You heard it yesterday.  I'm not

16 going to go through those messages again.  We went through a

17 select few of the approximately 2,000 messages, maybe 150 of

18 them, in detail yesterday.  And I suspect that you've seen

19 and heard enough of those messages so I'm not going to do

20 that here today in court.

21        But if I'm wrong, if I'm wrong and one of you gets

22 back to the jury and you think, "You know what?  The

23 Government only showed us 150 messages.  Maybe somehow the

24 other 1,850 messages would make a difference," they're not

25 different, but they're in evidence.  So if you're wondering

1  about that, go back, look at them.  That's Government's

2  Exhibit 6B.  It is 300-plus pages of messages between the

3  Defendant and 15-year-old Taylor.  It is a play-by-play book

4  on how to entice and induce a kid into engaging in sex.  Go

5  look at it.

6            So May 8th comes around.  Five days, about 700

7  messages in, and the Defendant travels to Nashville.  And on

8  May 8th at 6:10 a.m. -- you can see it in the chats, in the

9  summary chart, Government's Exhibit 6A; or in the underlying

10 chats, 6B, you can see it.  At 6:10, he's at her apartment.

11           But it's not just in the chats, in case you were

12 worried those may be wrong.  You can look at his bank

13 statement.  You might have been asking yourself why

14 Mr. Oliver was testifying at trial.  Mr. Oliver was talking

15 about the bank statements, pointing out the dates that the

16 Defendant was making transactions with his bank card in

17 Nashville.

18           So after the Defendant, James Frei, traveled five

19 or six hours through the dark of night from North Carolina to

20 Nashville, he arrived in Nashville with the hopes of engaging

21 in a carnival of sex.  He wanted a little bit of everything:

22 a little vaginal, a little oral, and a little anal.  But he

23 just didn't want it.  He wanted to film it, he wanted to

24 photograph it, he wanted to document it.  He used Taylor,

25 15-year-old Taylor, to engage in sex for the purpose of

1  producing those photos and videos.

2            And on May 8th, he took six photos and three

3  videos.  And yesterday we didn't go through every single

4  photo of Taylor on his phone in a sexually provocative

5  position.  We didn't watch the videos in full.  We saw a few

6  seconds, we looked at a few photos: six photos, three videos

7  from that first trip.  The best part of those videos that we

8  watched on that TV screen in court yesterday, though, was

9  that one video from May 8th where the Defendant's camera, his

10 phone camera, panned right past his face as he went to focus

11 on Taylor and what she was doing.  The Defendant took those

12 videos.

13           When he was done with her, dropped her off, headed

14 back to North Carolina.  Wasn't the end of it, though.  Did

15 not stop there.

16           On May 9th, as soon as he gets back to

17 North Carolina, he starts it up again.  He's doing that

18 grooming process.  But now we've engaged in all types of

19 things, so maybe we'll suggest something a little different.

20 Maybe he'll buy her a dog collar.  Maybe he'll walk her

21 around on a leash.  Sure, why not.  Why not throw that out

22 there, a little S and M, a little dominance, submissive, some

23 bondage.  Why not, Taylor?  She's 15.

24           She doesn't even know what that means.  She told

25 you that.  Half these messages she received, she went with

1   it.  Her responses are, okay, yeah, smiley face.  She doesn't

2   say, "Yeah, I'd love to get on all fours and you drag me

3   around in a store by a leash and a dog collar."  That's not

4   her response.  She doesn't even understand these things.

5          But the Defendant can't get there for another nine

6   days.  So what's he do to tide himself over in the meantime?

7   In addition to messaging her, he watches those videos, those

8   videos from May 8th.  We know he watched those videos at

9   least three times because we have screenshots on them.  We

10  have one screenshot from May 11th and two screenshots from

11  May 16th.  And Detective Gish told you when he was watching

12  those videos, he hit a combination of buttons and he took a

13  screenshot.  He must have really liked what was happening in

14  the video at that particular moment with that particular

15  image upon his phone.

16         Comes over next time on May 17th.  Again, under

17  the cloak of darkness, he travels from North Carolina to

18  Nashville, Tennessee.  Gets there just a little after

19  midnight, but he doesn't see her right after midnight.  It's

20  really not possible.  Her dad's home overnight but he leaves

21  early because he's a manager at a gas station.

22         So he's at her door at 5:13 a.m.  But again, you

23  don't have to believe.  Just the chats.  Look at his bank

24  records.  Look at those transactions that occurred in

25  Nashville.

1　　　　　And on May 8th -- I'm sorry -- May 17th, as soon

2　as he got to her apartment at 5:13 a.m., he again engaged in

3　sexual activity with her and he filmed it.  What was Taylor

4　wearing?  She was wearing her purple nightgown with

5　butterflies, the nightgown of a 15-year-old kid.  That's what

6　she had on in that video.  Not what the Defendant wanted her

7　to wear, not the kind of outfit the Defendant sent her a

8　picture of asking if she'd like that.  And then in the chats

9　he clarified, well, did she like blond hair or did she like

10　the girl?  That's what he said to 15-year-old Taylor when he

11　sent her that photo.

12　　　　　Now, after May 17th, just a few more trips

13　scattered in there.  Taylor says she does not recall a trip

14　where they didn't have sex.  But I want to fast-forward to

15　her birthday weekend.  She turned 16 on May 30th.  And on

16　June 3rd through June 6th, that was her birthday weekend.

17　She was going to be having a party.  And the Defendant --

18　although 16, she's still a minor, she's still

19　impressionable -- Defendant travels, once again, to

20　Nashville.

21　　　　　But this time, he gets a hotel, and he's going to

22　stay until Monday morning, stay at least three days.  And on

23　June 3rd, he arrives.  He eventually comes and picks her up

24　from her apartment and he takes her back to his hotel, and he

25　takes ten photographs of Taylor in sexually provocative

1  positions standing in the bathroom area of his hotel room.

2  And we looked at one of those images. We looked

3  at the image, 7E-21, that's cropped on the screen for you

4  here. There was more to that image. Go back and look at it.

5  But it's the Defendant and Taylor naked, and the Defendant's

6  holding that cell phone, that LG L33L, and he's taking a

7  selfie of the two of them in the mirror.

8  Fast-forward two days to June 5th. Taylor goes

9  back to his hotel, and it's on that occasion that he takes

10  four of the most up close and personal images of her: one

11  photo and three bursts, up close and personal, of her vagina.

12  She told you she didn't remember him specifically taking

13  those photos but that she looked at them prior to coming into

14  court, and she believed those to be photos of her. And they

15  even had the mole that 15-year-old -- well, at that time

16  16-year-old Taylor had at the top of her leg. Fits with the

17  timeline. When those photos were taken on her phone, he was

18  in Nashville at the Motel 6.

19  Now, thanks to Facebook and their cyber tip, those

20  were the last photos that the Defendant was able to produce

21  of 15-, 16-year-old Taylor.

22  You might have been asking yourself during this

23  trial how in the world a 15-year-old fell prey to the

24  Defendant. She's going through a rough time and she thought

25  he cared about her. So to her, this relationship, if you

1  want to call it that, as odd as it may be to any of us

2  sitting in this courtroom, it filled a void for her.  But to

3  him, to the Defendant, James Frei, it was all about his

4  master plan to turn Taylor into what he needed her to be to

5  satisfy his sexual desires.  Sex that she was too young to

6  legally consent to.

7              He complimented her, told her he loved her, he

8  told her he missed her.  And he introduced her -- he told her

9  he would buy her things.  And he introduced her to a

10 *50 Shades of Grey* kind of world, a world that Taylor did not

11 fully comprehend and a world that she likely didn't even know

12 existed on May 3rd, 2016, when she responded to his first

13 message:  "Oh, my God.  So sexy.  How old?"

14             He is guilty.  Find him guilty.  Thank you.

15             THE COURT:  Thank you, Ms. Risinger.

16             Mr. Buckholts?

17             MR. BUCKHOLTS:  Good morning, ladies and gentlemen

18 of the jury.  Thank you for your service and listening to

19 this case.  Mr. Frei thanks you for listening to this case.

20             I wanted first to go back and talk about at the

21 very beginning of the trial.  We talked about the elements of

22 each and every count, the burden of the Government to prove

23 each and every count beyond a reasonable doubt.

24             Now, the Judge is going to instruct you on what

25 the law is.  He's going to give you that instruction in just

1    a little bit.  I ask that you pay careful attention to the

2    instructions that you receive and all of the instructions in

3    full, that you don't gloss over anything, that you go back

4    and you look at each and every element, you consider the

5    evidence that you've heard in this case, and you consider

6    everything before you reach a verdict.

7           I want to start out, I'm going to talk about,

8    really, two main things in this case.  I want to talk about

9    the relationship with Mr. Frei, between Mr. Frei and

10   Ms. Bushong and how the Government's characterized it.  And

11   then I want to talk about, after that, I'm going to go

12   through the elements of Counts 1 through 4 very carefully

13   with each and every one of you.  I'm going to talk about

14   that.

15          Now, the Government has portrayed this

16   relationship as -- in a different way, as Taylor Bushong

17   being impressionable.  I think all 15-year-olds, 15-,

18   16-year-olds, that's true to a certain extent.  But they

19   portrayed it almost as if she was drug in kicking and

20   screaming into this action.

21          If you look at the first couple of pages of the

22   government's exhibit -- when you're going to go back, you'll

23   have the Facebook messages -- this was pretty much, right

24   from the start, an agreement to engage in a sexual

25   relationship from the beginning.  That doesn't make it right,

1    it doesn't make it good.  There are elements of other counts

2    in this indictment that address those things.  But to -- I'm

3    not going to get an opportunity to talk to you again, so I'm

4    going to make sure I go through some of these things as to

5    the relationship aspect of it.

6              One of the things about this, the Government

7    mentioned the pure volume of these Facebook chats, and there

8    are a lot.  There are a bunch of them.  If you go through

9    those, there are going to be hearts back and forth to each

10   other.  There was -- as they get later in time, there is more

11   expressions between the two of them of affection.  There are

12   discussions of gifts.

13             There was some testimony Ms. Bushong couldn't

14   remember, had to be reminded on certain things, said she

15   had -- what I recall what she said at first was that she

16   thought every trip was -- there was sexual activity, and then

17   she couldn't remember.

18             Some of those things, I think you have to use your

19   common sense and reason to determine, you know, would you

20   remember that or not?  Would you remember whether you had a

21   sexual encounter or not?  I know it's been two years, but

22   that's a pretty significant event in somebody's life, and so

23   I don't believe it's entirely accurate.

24             And if you look at the context of the Facebook

25   messages, for anybody to say that there wasn't some affection

1  between both Ms. Bushong and Mr. Frei, obviously, there's a

2  difference in the two parties as to influence and

3  impressionability.  But to characterize it, Ms. Bushong is

4  just being so reluctant that she was almost forced into this

5  relationship, I know that the Government didn't go that far,

6  but it went pretty far to say that she was -- she was very

7  willing, you can tell, from the Facebook chats right away.

8         So that gets us into Counts 1 through 4, and I

9  posted those up there for you.  Hopefully they're big enough.

10  You're going to get these again back when you're able to go.

11  The Judge is going to instruct you, but I want to walk

12  through those things with you.

13         You've got the four counts with the four dates.

14  You've got the May 8th, the May 17, the June 3rd, and the

15  June 6th events.  And if you look at count -- at the count,

16  you've got A and B; you've got a first and a second there.

17  Now, the second element there is not in dispute.  Whether the

18  visual depictions -- you've seen evidence of visual

19  depictions.  There's no question about that.  They traveled

20  across state lines.  You've heard testimony about that.

21  There's no dispute on that.

22         But what there is a dispute is, is that the

23  Defendant employed, used, persuaded, induced, enticed, or

24  coerced Taylor Bushong to engage in sexually explicit

25  conduct.  And I bolded for the purpose of producing a visual

1  depiction.

2          Now, the Government would have you believe that
3  you have to find, well, they had sex and there was a video
4  created, so it must have been for the purpose of creating the
5  video.  That must have been the purpose of the sexual act.

6          Ladies and gentlemen, I would contend to you that
7  the sexual acts were for the purposes of having sex.  This
8  was not a situation where you had, you know, a camera crew
9  and you had a hidden camera somewhere and where a Defendant
10  may have taken photographs or videos or had something hidden.
11  This was out in the open with knowledge as far as the -- as
12  far as the photographs.  So those would suggest that the
13  sexual relationship wasn't for the purpose of the
14  photographs.

15          Now, let me give you some -- you need to use your
16  common sense and reason when you go back in the deliberation
17  room.  When you go back there -- and I'm going to give you
18  some examples of how to think about photographs and events
19  where you take photographs.  Now, some of you may have family
20  members that play in sports.  Some of you may have played
21  sports.  And you had a sporting event, maybe it was a
22  football game, and maybe you asked somebody to come out there
23  and take the photographs of your football game or your
24  basketball or whatever sporting event it is.  And so they
25  took pictures.

1          Now, the purpose of the photograph, as the

2   Government said, would be to memorialize the event.  But it

3   wouldn't be -- the football game itself, the activity, is not

4   for the purpose of -- you're not doing the act so that you

5   can create or have a photograph of it.  It's a

6   memorialization of an event.

7          And it would be the same if you had any major

8   event in life.  A lot of people, if they get married, will

9   have photographs taken of their -- of the events at their

10  wedding.  You wouldn't say, "Well, they had the wedding for

11  the purpose of creating a visual image of the wedding."

12         So if you look at the statute and what it says for

13  the purpose of producing the visual depiction, now you may

14  say to yourself, "Well, what could be some times where you

15  would have a photograph or a video or you would do an action

16  for the purpose of creating a video or photograph of that

17  event?"

18         Well, we can think, in the social media age, of a

19  lot of different things.  I'll give you a couple of examples.

20  Whenever there's a movie that you go see at the movies or you

21  watch a video, that's clearly one where the actions on the

22  video are for the purposes of creating the video.  Another

23  would be fashion magazines, people posing and -- in a certain

24  magazine, would be for the purpose of creating the visual

25  depiction so that you sell advertisements, things like that.

1       Another one would be maybe you wanted to -- you

2   were trying to sell a vehicle, and so you clean your car up

3   and then you take photographs of it so you can put it online

4   and try to sell it.  Those would be some examples of clearly

5   a photograph -- you know, the events that are depicted being

6   for the purpose of producing a visual depiction, a video.

7       Now, this situation is different in this respect.

8   Unfortunately -- of course, not excusing the conduct;

9   nobody's here to argue anything about excusing the conduct.

10  But frankly, the facts of this case, if you look at the

11  facts, you look at the context of what was going on here,

12  this was a sexual relationship for the purpose of having --

13  the sex acts were for the purpose of having sex.  And that's

14  what it is.

15      There were videos created, but that doesn't mean

16  that if -- and this would be hypothetically, but I think you

17  might be able to draw inferences from this.  I think if you

18  go back and you look at the conversations that Ms. Bushong

19  and Mr. Frei had, they're talking about sex in a whole lot of

20  them, in most of them.  But they also, during that time,

21  talk -- they do talk about some other things as the

22  relationship, you know, gets further down in time.  It's

23  going to start out in early May and it goes to July 10th.

24  And so you have some changes as it goes on.

25      Even early on in the -- for instance, Ms. Bushong,

1  I believe it's on page 45, roundabout there, she talks about
2  where she's not wanting to go to school.  And Mr. Frei
3  responds, well, he doesn't want to go to work either but he's
4  good to go.  He's got to go.  I think it was GTG.  So they
5  discuss other things in there.  They do discuss things.  They
6  talk about affection.
7          And again, that's not right and there are a bunch
8  of other counts and you may very well look at the evidence.
9  For instance, the travel in interstate commerce for the
10  purposes of having sex with a minor, you may very well find
11  that the Government has met its burden of proof on those
12  facts and the elements of those counts.
13          But on these counts, you can't find that.  You
14  can't -- the circumstantial evidence does not weigh in the
15  favor of the Government on those.  The Judge talked about
16  circumstantial evidence, and I would say in this case
17  there's -- really, this would be a circumstantial evidence
18  case.  You can't -- obviously, nobody can read anybody's
19  mind, so it always makes it difficult to figure out what
20  somebody's intent, why they do something.  So when we started
21  out, we talked about the what, where, when -- who, what,
22  when, and where, and then the why.
23          And so the Government is saying, well, look at the
24  entire relationship.  They took the photographs; must have
25  been for the purpose of the photographs.  That's the

implication.

Now, when the Judge talked about circumstantial evidence, he gave an example of if it's raining outside. And circumstantial evidence would be a person walks into the courtroom, they sit down there at the witness stand, they have an umbrella, and it's wet. That would be circumstantial evidence that the jury could draw inferences that it's probably raining outside.

It's not always that clear-cut when it comes to circumstantial evidence. I would give -- what if a person came in with an umbrella and they walked in and they sat there at the witness stand but it wasn't wet. So you have, well, there might be a suggestion that it might be raining, but this person might just carry their umbrella around everywhere they go.

Obviously, direct evidence, the Judge said, would be if somebody said, "Hey, it's raining outside," and that was the testimony you heard. Well, you don't have any witness obviously for direct evidence, you know. You don't have any evidence that says that the sexually explicit conduct, the sex acts, were for the purpose of producing a photograph. You don't have any officers saying that. You don't even have Ms. Bushong saying that.

So that leads us to the circumstantial evidence in the case. And so what you have to look at in determining

1  whether the photographs and videos or the sexual conduct was

2  for the purpose of producing the visual depiction is, you

3  have to look at the entire case.  You have to use your

4  commonsense reason.

5          And it's Mr. Frei's contention -- and the evidence

6  supports this -- that as improper as you find it, as morally

7  repugnant, that those sexual acts were not for the purpose of

8  producing the photos or the videos.

9          So for that reason, on Counts 1 through 4, there

10  is just not sufficient evidence.  The Government has a

11  burden of proof to find each and every element of Counts 1

12  through 4 beyond a reasonable doubt.  And if you go back and

13  you look at the heart emojis and all of the things in there

14  relationship-wise, and also consider the fact that these

15  Facebook messaging back and forth continued on even after the

16  sexual acts in the photographs were taken.  I kind of think

17  you could also look at it in a way:  If this were for the

18  purpose of creating the photographs for visual images, well,

19  that was done the first day, but the relationship continued.

20          The bottom line is, Ms. Bushong and Mr. Frei were

21  having sex for the purpose of having sex.  It wasn't to

22  create a video, it wasn't to create a photograph.  And so,

23  therefore, on Counts 1 through 4, I ask that you return a

24  verdict of not guilty.

25          Now, on the other counts, you may find that there

1  is sufficient evidence on those.  Go back and review those

2  counts, and if you -- there very well could be counts that

3  you find that there is sufficient evidence.  But on these

4  four counts, you should not -- you should render a verdict of

5  not guilty on that.

6          Ladies and gentlemen of the jury, I thank you for

7  your service.  And thank you.

8          THE COURT:  Thank you, Mr. Buckholts.

9          Ms. Risinger?

10         MS. RISINGER:  Let me be clear:  He does not have

11 to use Taylor to engage in sexual activity for the purpose --

12 for the sole purpose of producing child pornography; rather,

13 that has to be a purpose.  It's not mutually exclusive.  He

14 can want to have sex with her, he can enjoy the sex with her,

15 and he can also use her to engage in that sex for the purpose

16 of producing child pornography.  It does not have to be a

17 sole purpose and it doesn't have to be premeditated.

18         Doesn't have to be thinking about it when he's

19 back in North Carolina, although there's evidence he was when

20 he was talking about "Can I take photos."  He's asking her if

21 she's ever seen a porno, would she want him to bring a sex

22 movie for them to watch.

23         The production value of those videos, whether

24 there were big lights and camera and sexy scenes, also

25 doesn't matter.  These videos and these photos weren't being

1  produced so they could end up on Pornhub; they were being

2  produced so the Defendant could go back and watch them over

3  and over and over.  Circumstantial evidence that he used

4  Taylor to engage in sexually explicit activity for the

5  purpose of producing images and movies: the number of photos

6  and videos.  Every image of Taylor that was taken with his

7  phone revolved around sex.  The only three clothed pictures

8  recovered from his phone of Taylor were downloaded from

9  Facebook or received.  Every single photo and video he took

10  with his phone, the number, the sheer number of those, 27,

11  that's circumstantial evidence.

12          The instruction he would give her during the

13  videos, you heard a little bit of it when we played one of

14  those videos for a few seconds, but you also heard

15  Detective Gish talk about what he would hear when he watched

16  and listened to the full video.  You heard her tell you

17  sometimes he'd say, "Smile" in the videos.  "Open your mouth.

18  We need to get you over this shyness."

19          In that video from May 17th when he pulls down her

20  nightgown and pants to her face, and she clearly hunches

21  other and puts her arms over her exposed breasts and her head

22  down, "We need to get you over that shyness," his

23  instructions.

24          How he would adjust the camera during the videos,

25  panning from one part of Taylor's body to another.  That's

1  circumstantial evidence.  His retention of the photos and
2  videos, the fact that he still had them when Detective Adkins
3  seized his phone on our search, you heard Detective Gish tell
4  you those weren't deleted.  And we know -- we know he watched
5  them; we know he looked at them.  It doesn't have to be the
6  sole purpose, just a purpose.
7          You're not missing anything.  Don't overthink
8  this.  Like my co-counsel, Mr. Suedekum, told you in opening,
9  the evidence in this case is overwhelming.  He is guilty.
10  Find him guilty.
11          THE COURT:  All right.  Thank you, Ms. Risinger.
12          **(End of excerpt.  Proceedings occurring after this**
13  **excerpt included in Trial Volume 3.)**
14                          *   *   *
15
16
17
18
19
20
21
22
23
24
25

```
1    REPORTER'S CERTIFICATE

2

3              I, Deborah K. Watson, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6              That I reported on the stenotype shorthand machine

7    the proceedings held in open court on February 14, 2019, in

8    the matter of United States of America vs. James Frei, Case

9    No. 3:17-cr-00032;

10             That an excerpt of proceedings in connection with

11   the hearing was reduced to typewritten form by me;

12             That the foregoing transcript (pages 1 through 29)

13   is a true and accurate record of the proceedings to the best

14   of my skills and abilities;

15             This the 1st day of September, 2020.

16

17                              /s/ Deborah K. Watson
                                _____
18                              DEBORAH K. WATSON, RPR, CRR
                                Official Court Reporter

19

20

21

22

23

24

25
```